# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| PAUL SCHWARTZ, individually as a shareholder of Perseon Corporation (f/k/a BSD Medical Corporation), and on behalf of Perseon Corporation (f/k/a BSD Medical Corporation),<br><br>Plaintiff,<br><br>v.<br><br>PERSEON CORPORATION (f/k/a BSD MEDICAL CORPORATION); TIMOTHY C. MCQUAY; GERHARD W. SENNEWALD; MICHAEL NOBEL; DOUGLAS P. BOYD; STEVEN G. STEWART; DAMIEN E. DUPUY; HAROLD R. WOLCOTT; WILLIAM S. BARTH, DENNIS P. GAUGER, SAM MARAVICH JR.; and CLINTON E. CARNELL, JR.,<br><br>Defendants. | Case No. _____<br><br><br>Jury Trial Demand |

## COMPLAINT

Plaintiff Paul Schwartz ("Plaintiff"), individually, as a shareholder of Perseon Corporation (f/k/a BSD Medical Corporation), and on behalf of Perseon Corporation (f/k/a BSD Medical Corporation),  by his attorneys, brings this Complaint against Defendants Perseon Corporation (f/k/a BSD Medical Corporation) ("Perseon" or "BSD" or the "Company"), Timothy C. McQuay ("McQuay"), Gerhard W. Sennewald ("Sennewald"), Michael Nobel ("Nobel"), Douglas P. Boyd ("Boyd"), Steven G. Stewart ("Stewart"), Damien E. Dupuy ("Dupuy"), Harold R. Wolcott ("Wolcott") (the "Director Defendants"), William S. Barth ("Barth"), Dennis P. Gauger ("Gauger"), Sam Maravich, Jr. ("Maravich"), and Clinton E. Carnell, Jr. ("Carnell") ("Executive Defendants") (collectively "Defendants") and allege as follows:

## I.      NATURE OF THIS ACTION

1.      This securities action and derivative action arises out of the material misstatements and omissions by the Defendants named herein as well as the issuance of additional securities in violation of the business judgment rule to the detriment of BSD's shareholders, as well as the subsequent failure of Defendants to adequately address such violations after being served with a derivative demand.

2.      Throughout Fall 2010 through present (the "Investment Period"), BSD and its officers and directors disseminated a series of press releases misrepresenting and omitting material facts related to BSD's revenue and sales with the intent to entice investment in an otherwise floundering company.

3.      Additionally, in an attempt to raise capital to cover operating expenses, including board fees and executive compensation, Defendants engaged in not one, not two, but three securities offerings at below-market prices during the Investment Period resulting in a dilution of existing shareholders' interests.

4.      As a result of the material misstatements and omissions, and multiple securities offerings at below-market prices, Plaintiff and other BSD investors suffered immense losses as BSD's stock price dropped a dramatic 85% from November 2010 to June 2014. The stock has failed to recover and has continued to decrease from June 2014 to April 2015, by an additional 70%.

5.      After being served with a demand concerning the aforementioned issues, among other things, BSD's Board of Directors purported to hire independent special counsel to conduct and direct an investigation into such allegations in the demand; the investigation however was biased, unreasonable, and was not conducted in good faith.

## II.     JURISDICTION AND VENUE

6.     The claims asserted herein arise from Section 10(b) and 20(a) of the Exchange

Act of 1934 ("Exchange Act"; 15 U.S.C. §  77j, 15 U.S.C. §  78t(a)); Rule 10b-5 promulgated

thereunder (17 C.F.R. §240.10b-5); and violations under the common law of the State of

Delaware.

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331; Section

27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. § 1367 with respect to Plaintiff's

claims brought in accordance with the laws of the State of Delaware. This action is not collusive

to confer jurisdiction that the court would otherwise lack

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15

U.S.C. § 78aa) and pursuant to 28 U.S.C. § 1391(c)(2). The Company is incorporated under the

laws of the State of Delaware.

## III.    PARTIES

### A.     <u>Plaintiff</u>

9.     Plaintiff Paul Schwartz is and was at all times relevant to the subject matter of this

Complaint a citizen of the State of New York, County of Nassau. Mr. Schwartz as a purchaser of

stock in Defendant BSD maintains a private right of action against Defendants under the

Exchange Act and a derivative action on behalf of the Company. Mr. Schwartz was a

shareholder of BSD at the time of the misrepresentations, omissions, securities violations, and

transactions complained of herein.

### B.     <u>Defendants</u>

10.    Defendant Perseon Corporation (f/k/a BSD Medical Corporation) is a medical

device company that develops, manufactures, markets and services medical systems and is

incorporated under the laws of the State of Delaware. BSD's main product lines included three systems for the treatment of cancers: (i) the BSD-2000, a hyperthermia cancer treatment system; (ii) the BSD-500, a hyperthermia cancer treatment system; and (iii) the MicroThermX Microwave Ablation System (MTX-180), a microwave ablation system.   BSD is currently a public company traded on the NASDAQ and trades under the ticker symbol "PRSN" and was formerly traded on the NASDAQ under the ticker symbol "BSDM".

11.     Defendant Timothy C. McQuay has been on BSD's Board of Directors since 2008. He currently is the Chairman of the Board.  As BSD's Chairman of the of the Board, he was involved with BSD's decision to raise capital to fund operating expenses by issuing additional shares of BSD's common stock and warrants, which in turn negatively impacted existing shareholders as it diluted their interests in BSD as well as immediately and significantly reducing the market value per share. Further, McQuay participated in the decision to sell the hyperthermia line of business in a fraudulent transfer of assets to a newly formed company in which two former directors have a financial interest.

12.     Defendant Gerhard W. Sennewald was on BSD's Board of Directors beginning in 1994 and resigned in 2015.  As a Director of BSD, he was involved with BSD's decision to raise capital to fund operating expenses by issuing additional shares of BSD's common stock and warrants, which in turn negatively impacted existing shareholders as it diluted their interests in BSD as well as immediately and significantly reducing the market value per share. Further, Sennewald participated in the decision to sell the hyperthermia line of business in a fraudulent transfer of assets to a newly formed company in which two former directors have a financial interest.

13.     Defendant Michael Nobel has been on BSD's Board of Directors since 1998.  As a Director of BSD, he was involved with BSD's decision to raise capital to fund operating expenses by issuing additional shares of BSD's common stock and warrants, which in turn negatively impacted existing shareholders as it diluted their interests in BSD as well as immediately and significantly reducing the market value per share. Further, Nobel participated in the decision to sell the hyperthermia line of business in a fraudulent transfer of assets to a newly formed company in which two former directors have a financial interest.

14.     Defendant Douglas P. Boyd was on BSD's Board of Directors beginning in 2005 and resigned in 2015. As a Director of BSD, he was involved with BSD's decision to raise capital to fund operating expenses by issuing additional shares of BSD's common stock and warrants, which in turn negatively impacted existing shareholders as it diluted their interests in BSD as well as immediately and significantly reducing the market value per share. Further, Boyd participated in the decision to sell the hyperthermia line of business in a fraudulent transfer of assets to a newly formed company in which two former directors have a financial interest.

15.     Defendant Steven G. Stewart has been on BSD's Board of Directors since 2006. As a Director of BSD, he was involved with BSD's decision to raise capital to fund operating expenses by issuing additional shares of BSD's common stock and warrants, which in turn negatively impacted existing shareholders as it diluted their interests in BSD as well as immediately and significantly reducing the market value per share. Further, Stewart participated in the decision to sell the hyperthermia line of business in a fraudulent transfer of assets to a newly formed company in which two former directors have a financial interest.

16.     Defendant Damien E. Dupuy has been on BSD's Board of Directors since 2011. As a Director of BSD, he was involved with BSD's decision to raise capital to fund operating

expenses by issuing additional shares of BSD's common stock and warrants, which in turn negatively impacted existing shareholders as it diluted their interests in BSD as well as immediately and significantly reducing the market value per share. Further, Dupuy participated in the decision to sell the hyperthermia line of business in a fraudulent transfer of assets to a newly formed company in which two former directors have a financial interest.

17.     Defendant Harold R. Wolcott has been on BSD's Board of Directors since April 2009, and was its President between April 2009 and November 2014. Wolcott resigned from his position as BSD's Chief Executive Officer in November 2014, however, remains on BSD's board of directors and maintains a consultant position with BSD. As BSD's President, Wolcott disseminated false and misleading information to investors in press releases and signed and certified certain of the Company's false and misleading Forms 8-K, 10-Q and 10-K disseminated or filed during the Investment Period. As a Director of BSD, he was involved with BSD's decision to raise capital to fund operating expenses by issuing additional shares of BSD's common stock and warrants, which in turn negatively impacted existing shareholders as it diluted their interests in BSD as well as immediately and significantly reducing the market value per share. Further, Wolcott participated in the decision to sell the hyperthermia line of business in a fraudulent transfer of assets to a newly formed company in which two former directors have a financial interest.

18.     Defendant William S. Barth has been the Chief Financial Officer ("CFO") of BSD since December 2012. As the Company's CFO, Barth signed certain of the Company's false and misleading Forms 8-K, 10-Q, and 10-K disseminated or filed during the Investment Period, as well as disseminated false and misleading information to investors during BSD's investor calls and in BSD press releases. Barth was involved in the decisions to issue additional

shares of BSD's common stock and warrants, which in turn negatively impacted existing shareholders as it diluted their interests in BSD as well as immediately and significantly reducing the market value per share. Barth was also involved in the decision to omit the material disclosure of the risk resulting from a threatened direct, derivative and securities class action lawsuit against the Company.  Further, Barth participated in the decision to sell the hyperthermia line of business in a fraudulent transfer of assets to a newly formed company in which two former directors have a financial interest.

19.     Defendant Dennis P. Gauger is a former CFO of BSD. Gauger was the full-time CFO of BSD from 2008 to 2012. As the Company's CFO, Gauger signed certain of the Company's false and misleading Forms 8-K, 10-Q, and 10-K disseminated or filed during the Investment Period, as well as disseminated false and misleading information to investors during BSD's investor calls and in BSD press releases. Gauger was also involved in the decision to issue additional shares of BSD's common stock and warrants, which in turn negatively impacted existing shareholders as it diluted their interests in BSD as well as immediately and significantly reducing the market value per share.

20.     Defendant Sam Maravich Jr. was the Vice President of Sales and Marketing at BSD. Maravich disseminated false and misleading information in BSD's press releases.

21.     Defendant Clinton E. Carnell, Jr. is BSD's President and Chief Executive Officer ("CEO"). Carnell was appointed President and CEO on or about November 10, 2014. As BSD's President, Carnell disseminated false and misleading information to investors in press releases and signed and certified certain of the Company's false and misleading Forms 8-K, 10-Q and 10-K disseminated or filed during the Investment Period. Carnell was also involved in the decision to omit the material disclosure of the risk resulting from a threatened direct, derivative and

securities class action lawsuit against the Company.  Further, Carnell participated in the decision to sell the hyperthermia line of business in a fraudulent transfer of assets to a newly formed company in which two former directors have a financial interest.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    <u>Plaintiff's Investment in BSD</u>

22.    Mr. Schwartz first learned of BSD in Summer 2010.

23.    Before deciding to invest and purchase stock in the Company, Mr. Schwartz reviewed the financials and press releases of BSD. His review of the relevant documents revealed that in August 2010 the Company received FDA approval to market and sell a medical device used to treat cancer—the MicroThermX Microwave Ablation System ("MTX-180"). Accordingly, Mr. Schwartz purchased a substantial quantity of BSD's stock in the fall of 2010.

24.    Mr. Schwartz's initial investment was also influenced by his personal experiences with cancer.  When Mr. Schwartz was just 20 years old, he experienced his mother suffering through surgery, radiation and chemotherapy in the 1970's, before succumbing to lung cancer. Mr. Schwartz was excited to see a treatment that alleged to shrink or eliminate cancerous tumors without many of adverse side effects of other cancer treatments. The documents released by BSD led Mr. Schwartz to believe that the efficacy of the MTX-180 treatment appeared to be much better than that of chemotherapy and radiation treatments for many cancers, without the debilitating side effects.

25.    Mr. Schwartz's enthusiasm for the MTX-180, along with the representations (or misrepresentations) discussed below, were the basis for Mr. Schwartz's significant investment in BSD.

26.    Indeed, between the years 2010 to 2013, Mr. Schwartz invested substantially into BSD's common stock.

27.     Unfortunately, as a result of material misrepresentations and omissions by BSD and the individual Defendants and the wrongful dilution of shareholder interests, amongst other things, the value of Mr. Schwartz's investment decreased dramatically, resulting in a loss of a very substantial sum.

## B.     Executive and Director Defendants' Materially False and Misleading Statements

28.     Throughout the Investment Period, particularly beginning in early 2012, BSD issued a series of press releases touting its financial performance, sales initiatives, contract acquisitions, and purported success, amongst other things.

29.     For example, on or about April 6, 2012, BSD issued a press release stating, in relevant part:

> We are experiencing early success with a revenue stream from sales of disposable SynchroWave antennas combined with highly profitable equipment rental fees. We have added experienced sales personnel in key markets, and believe the equipment rental program will produce successful results throughout the United States.

30.     On July 6, 2012, BSD issued a press release stating, in relevant part, "'We are pleased to report **increasing revenues** from sales of disposable SynchroWave antennas combined with **highly profitable** equipment rental fees for our MicroThermX Ablation System ("MicroThermX")', said Harold Wolcott." (Emphasis added).

31.     On July 11, 2012, BSD issued a press release stating, in relevant part, "that the Company has now **significantly** expanded the MicroThermX Microwave Ablation System ("MicroThermX") market opportunity by introducing a new SynchroWave short tip (ST) antenna." (Emphasis added).

32.     On August 29, 2012, BSD issued a press release stating, in relevant part:

> BSD Medical Corporation . . . announced that the Company has expanded the MicrothermX Microwave Ablation System (MicroThremX) Direct sales program

9

into additional high density metropolitan areas in the U.S. BSD has hired two new direct sales representatives to cover the **Ohio, western Pennsylvania and northern Kentucky area, as well as the Texas and Oklahoma area. BSD already has direct sales representatives covering the following key metropolitan areas: Florida, New York, New Jersey, Philadelphia, Chicago, Detroit, Phoenix, Las Vegas, southern California, Dallas and Houston.** BSD moved to a direct sales model to focus on high density populated areas.

"We are pleased with the success of the direct sales model for the MicroThermX," said Harold Wolcott, BSD President and CEO. "The direct sales model will allow BSD to clearly focus on major areas of opportunity in the ablation market and to build strong relationships with our customer base that will provide an ongoing revenue stream. The direct sales model has resulted in a **significant increase in requests for purchase** and interest in the fee-per-use rental program."

(Emphasis added).

33.     On October 9, 2012, BSD issued a press release stating, in relevant part:

BSD . . . announced today a **391% increase in sales** for the MicroThermX Microwave Ablation System ("MicroThermX") product line for September 2012 as compared to September 2011. Disposable SynchroWave antennas were a significant portion of these sales, reflecting the success of the Company's fee-per-use equipment rental program and increasing utilization of MicroThermX equipment. This is a **dramatic increase in sales** for MicroThermX products and **representative of a continuing trend of accelerating MicroThermX revenue. MicroThermX product sales also grew significantly during the fourth quarter of fiscal year 2012, as compared to the fourth quarter of fiscal year 2011**.

(Emphasis added).

34.     On October 18, 2012, BSD issued a press release stating, in relevant part, "the Company has signed an exclusive agreement with ADA Medikal (ADA) for the sale and distribution of the MicroThermX Microwave Ablation (MicroThermX) line of products in Turkey.

35.     On December 6, 2012, BSD announced that it had:

a **586% increase in sales** for the MicroThermX Microwave Ablation System (MicroThermX) product line for the fiscal quarter ended November 30, 2012, as compared to the fiscal quarter ended November 30, 2011. Disposable SynchroWave antennas were a significant portion of these sales, reflecting the

success of the Company's fee-per-use equipment rental program and increasing sales of MicroThermX equipment. This is a **dramatic increase in sales for MicroThermX products and representative of a continuing trend of accelerating MicroThermX revenue**.

BSD's current focus is to increase MicroThermX revenue by expanding the fee-per-use equipment rental program and increasing direct sales support in major U.S. metropolitan areas.

(Emphasis added).

36.     On January 10, 2013, BSD issued a press release reporting "MicroThermX revenues of $.5 million in Q1 compared to $73,129 in Q1 2012."

37.     On January 14, 2013, BSD issued a press release stating that "the Company has sold multiple MicroThermX Microwave Ablation (MicroThermX) systems and antennas to ADA Medikal (ADA), pursuant to their exclusive distribution agreement signed in October 2012 for the MicroThermX in Turkey. ADA is a leading, medical, specialty distributor in Turkey . . . ."

38.     On January 31, 2013, BSD issued a press release stating that a "major East Cost academic medical center . . . has purchased a BSD-500 Hyperthermia System . . . .The Center is launching an **extensive** new hyperthermia program to capitalize on the advantages provided by hyperthermia treatment." (Emphasis added).

39.     On February 26, 2013, BSD issued a press release announcing:

a **319% increase in sales** of its MicroThermX Microwave Ablation System (MicroThermX) disposable SynchroWave antennas during the first five months of fiscal 2013, when compared to the first five months of fiscal 2012 sales of its SynchroWave antennas. BSD President Harold Wolcott stated, "**this increase in sales of disposable antennas is indicative of the growing acceptance and use of MicroThermX products in the ablation market.**"

(Emphasis added).

40.     On March 20, 2013, BSD issued a press release reporting, in relevant part:

that the Company has signed an exclusive agreement with Linden Bioscience Co., Ltd. (Linden), a Taiwan corporation, for the sale and distribution of BSD's hyperthermia products in Taiwan.

Linden is required to purchase a minimum number of BSD-2000 systems annually over a five year period, totaling a cumulative $7.1 million in revenue to BSD.

With the addition of Taiwan, our exclusive Asian distributors have committed to minimum purchases, which could total more than $26.0 million in revenue to BSD over a five year period.

41.     On March 28, 2013, BSD issued a press release reporting:

- Total revenue of $1.5 million for the six months ended February 28, 2013 compared to total revenues of $0.9 million for the same period a year ago

- Total revenues of $0.8 million for the second quarter ended February 28, 2013 compared to total revenues of $0.3 million of the second quarter of last year

This press release also stated in part:

Our results reflect solid market penetration trends for our MicroThermX Microwave Ablation product line for the treatment of cancer," said Harold Wolcott, President of BSD. "Revenues during the first six months of fiscal 2013 increased by approximately $0.5 million over the same period last year due largely to the performance of MicroThermX including **strong sales momentum** of disposable SynchroWave antennas fueled by a doubling of domestic evaluations over the last six months and our fee per use model continuing to attract new accounts.

As we move into the second half of fiscal 2013, **we are planning for a significant expansion in the distribution of our MicroThemX systems in Europe**, contingent upon our completing a Master Distribution Agreement covering the entire continent. We are working diligently on this agreement.

Our relationship with Linden, with its commitment to purchase an estimated $7.1 million in BSD product over a five year period, **further validates our belief that the Hyperthermia business will flourish in Asia as regulatory approvals are secured.**

(Emphasis added).

42.     On  April 8, 2013, BSD issued a press release announcing "that the Company has

signed **an exclusive, long-term, multi-million dollar distribution agreement** with Terumo

Europe NV, a wholly owned subsidiary of Terumo Corporation (Terumo) for the MicroThermX

Microwave Ablation System (MicroThermX)." (Emphasis added). The press release also stated,

in relevant part,

> A world leader in the state-of-the-art medical devices and interventional oncology, Tokyo-based Terumo Corporation (TYO JP:4543) reported 2012 sales of nearly $5 billion and has a market cap in excess of $8 billion.

> Under the terms of the distribution agreement, Terumo Europe NV will have the exclusive right to market MicroThermX in 100 countries in Europe, Western Asia, and Northern Africa. The potential market size for MicroThermX in these countries is estimated to be in excess of $1 billion in annual sales.

> "Revenues from our agreement with Terumo Europe NV should commence by the end of the third quarter of our fiscal year 2013 and are expected to make a substantial contribution to our overall revenue over the next few years. Longer term, we expect this agreement will make a strong contribution toward our objective of achieving profitability" said Harold Wolcott, BSD President and CEO.

43.     On May 16, 2013, BSD issued a press release stating:

> Terumo Corporation will begin commercial distribution of the MicroThermX Microwave Ablation System (MicroThermX) on June 19, 2013, at the annual European Conference on Interventional Oncology (ECIO).

> MicroThermX will be the centerpiece for Terumo at the ECIO.

> "This exciting introduction by Terumo of the MicroThermX at ECIO will leave Terumo in an excellent position to capture market share in the growing interventional oncology market," said Harold Wolcott, BSD President and CEO. "BSD's exclusive distribution agreement with Terumo Europe NV for 100 countries represents one of the most significant milestones in our corporate history. **The potential market size for thermal ablation in these countries is estimated to be in excess of $1 billion in annual sales."**

(Emphasis added).

44.     On October 24, 2013, BSD issued a press release stating, in relevant part, that:

Terumo has performed numerous clinical procedures throughout Europe, which has led to enhanced clinical acceptance and greater market penetration. **The market potential in the 100 countries included in the Terumo contract is in excess of $1 billion in annual sales. As a result of the increased clinical acceptance, Terumo continues to increase their purchases of MicroThermX generators and antennas.**

"Terumo has made a substantial investment in commercialization of the MicroThermX and their **market penetration has already exceeded our expectations**. . ." said Sam Maravich, Vice President of Sales and Marketing for BSD. **"The healthcare systems in the majority of European countries are structured to facilitate fast adoption of minimally invasive, efficacious, cost-effective, advanced technology like the MicroThermX."**

(Emphasis added).

45.     On September 29, 2014, BSD issued a press release stating, in relevant part, that:

Receiving renewal of the approval from the CFDA is a significant milestone for us and for Orientech, and it is a step forward in our vision to deliver the best health care products to hospitals and their patients around the world," said Sam Maravich, Vice President of International Sales and Marketing of BSD Medical. "While this was a long and difficult process, we are very excited that the process is now complete, and we look forward to the subsequent revenue opportunities this will yield for our product in the world's largest end-market for hypothermia. Orientech is committed to increasing the number of BSD-2000 systems installed in China.

BSD has a **long-term exclusive** distributor agreement with Orientech. The agreement requires Orientech to make yearly minimum purchases of the BSD-2000 over a four year period commencing upon receipt of the marketing and import license renewal. Orientech is recognized as a leading hyperthermia company in China and is one of the pioneers in commercialization of hyperthermia equipment in China. Orientech is also a leader and key contributor in hyperthermia education. Orientech has established strong relationships with physicians throughout China.

China has the world's largest population and ranks as one of the fastest growing markets in the world. China increased medical and healthcare spending by 26% in 2013 and 15.1% in 2014 to $133 billion. McKinsey & Company forecasts expect healthcare spending to increase to $1 trillion annually by 2020 due in large part to an aging population. China has over 10,000 hospitals with oncology departments. The Chinese medical device market is mostly supplied by imported products or devices made locally by multinational joint ventures.

(Emphasis added).

46.     During an investor and analyst presentation in September 2014, BSD represented that revenue from fiscal 2012 to 2014 had increased by 105%, before having reported on the last quarter of fiscal 2014.

### C.     The Truth is Revealed

      1.     BSD Dilutes its Equity to Fund Operating Expenses to the Detriment of Existing Shareholders

47.     Despite touting impressive revenue figures and purported sales during the Investment Period, in reality BSD was floundering and unable to cover its operating costs, including significant executive compensation.[1]

48.     Rather than raise capital through debt transactions or other methods, BSD instead chose to issue additional securities at below-market prices in an effort to fund operating expenses

---

[1] BSD has expended significant funds on executive compensation during the Investment Period. For example, pursuant to various SEC filings in 2014 and 2015, BSD's executives received the following compensation:

- Harold Wolcott, CEO: $275,000 annual base salary. Moreover, on November 10, 2014, Wolcott ceased his employment as CEO resulting in a severance pay of $275,000, in addition to all portions of his base salary due as of this date. In addition to the severance benefits, all options and other incentive awards granted to Wolcott by the Company prior to this date shall immediately vest and become fully exercisable in accordance with the terms and conditions of the Company's employee benefit plans;

- Clinton E. Carnell, Jr., CEO: $350,000 annual salary plus an annual bonus of $150,000 for the first year of employment, and a bonus of $150,000, or a pro rata portion thereof, for the second year of employment;

- William Barth, CFO: $200,000 annual base salary;

- Paul F. Turner, CTO: $220,500 annual base salary. Moreover, Mr. Turner was terminated without cause on December 19, 2014, resulting in a severance pay of $220,500, plus benefits and accrued, unused vacation at the time of termination.  Further, BSD may continue Mr. Turner's one year non-competition period for up to four additional years by continuing the severance payments for the additional years during which the non-competition period is extended.  Of particular note is that Mr. Turner was subsequently hired by Pyrexar Medical Inc., a newly formed corporation which received BSD's significant corporate asset—its hyperthermia cancer treatment system—for no cash in a contrived, fraudulent transfer of assets discussed in greater detail below.

no fewer than three times during the Investment Period, resulting in the dilution of existing shareholder positions (the "Dilution Events").

49.     The first instance of shareholder dilution during the Investment Period occurred on or about Monday November 15, 2010. On this date, BSD filed a Form 8-K stating in relevant part:

> the Company and certain existing institutional investors entered into a securities purchase agreement (the "Purchase Agreement") in connection with the Offering, pursuant to which the Company agreed to sell an aggregate of 1,750,000 shares of its common stock and warrants to purchase a total of 875,000 shares of its common stock to such investors for aggregate gross proceeds, before deducting fees to the Placement Agreement and other estimated offering expenses payable to the Company, of approximately $10.45 million. The common stock and warrants were sold in fixed combinations, with each combination consisting of one share of common stock and a warrant to purchase .50 shares of common stock. The purchase price is $5.97 per fixed combination. The warrants will become exercisable six months and one day following the closing date of the Offering and will remain exercisable for five years thereafter at an exercise price of $7.73 per share.

50.     On Friday November 12, 2010, the closing price of BSD's stock was $7.03. Pursuant to the Monday November 15, 2010 securities offering, as detailed in the Form 8-K filed with the SEC, the additional securities were issued at a below-the-market price of $5.97—a discount of more than 15%.

51.     Subsequently, on October 1, 2012, BSD issued a press release announcing that although it had a shelf registration statement for the issuance of up to $50 million in mixed securities, it had no current plans to offer these securities. Specifically, the press release stated in relevant part:

> It [had] a universal shelf registration statement with the Securities and Exchange Commission (SEC) for the issuance of up to $50 million in mixed securities. Once declared effective by the SEC, the registration statement will allow for the issuance of common stock, preferred stock, warrants, senior debt, subordinated debt and units up to an aggregate of $50 million. This registration statement was filed to replace a similar expiring registration statement. **Although BSD has no**

**current plans to do so**, it may periodically offer one or more of these securities in amounts, prices and on terms to be announced when and if the securities are offered.

(Emphasis added).

52.     On November 14, 2012, BSD issued a press release reporting "[t]otal revenues of $2,071,192 for the year ended August 31, 2012 compared to total revenues of $3,037,475 for the year ended August 31, 2011," and stated that it "believe[d] we are **sufficiently capitalized** to continue our sales and marketing product development efforts." (Emphasis added).

53.     On March 28, 2013, after reporting an increase in revenue, Wolcott, speaking for BSD, stated that, "We are keeping tight control of our spending, and our cash used in the quarter was $0.5 million less than we used during the first quarter fiscal 2013."

54.     Then, two weeks later, on April 9, 2013, in direct contravention to its **very recent** representations that BSD had no current plans to issue additional securities, it was "sufficiently capitalized" and there were tight controls on spending, BSD issued a press release announcing that it had:

> . . . entered into a securities purchase agreement with two institutional investors for the sale of 4,065,042 share of its common stock in a registered direct offering at $1.23 per share. In addition, warrants to purchase 3,048,782 shares of common stock in the aggregate will be issued to the investors . . . . Gross proceeds of the offering, before deducting placement agent fees and other estimated offering expenses payable are expected to be approximately $5 million.

> The net proceeds from this offering will be used for **general working capital purposes.**

(Emphasis added).

55.     On April 8, 2013, the closing price of BSD's stock was $1.65. Pursuant to the April 9, 2013 securities offering, as detailed in the Form 8-K filed with the SEC, the additional

securities were issued at a below-the-market price of $1.23—a discount of more than twenty-five

percent (25%).

56.     On June 26, 2014, in direct contravention to prior representations (and for a third

time during the Investment Period), BSD once again issued additional securities as detailed in a

press release stating, in relevant part:

> . . . that it [BSD] has entered into definitive agreements with institutional
> investors to raise approximate $5,225,000 in a registered direct offering at a price
> of $.95 per unit. The Company is offering an aggregate of 5,500,000 shares of the
> Company's common stock and warrants to purchase up to 4,400,000 shares of the
> Company's common stock. The common stock and warrants will be immediately
> separable. The warrants will be exercisable six months and one day after the
> closing and have a term of exercise of five years from when they are exercisable
> and an exercise price of $1.10 per share.
>
> BSD intends to use the net proceeds from the offering for **general working
> capital purposes**.[2]

(Emphasis added).

57.     In fact, on June 25, 2014, the closing price of BSD's stock was $1.06. Pursuant to

the June 26, 2014 securities offering, as detailed in the Form 8-K filed with the SEC, the

additional securities were issued at a below-the-market price of $.95—a discount of over ten

percent (10%).

58.     As a result of the three Dilution Events and material misrepresentations, BSD's

share price decreased dramatically. Indeed, in November 2010, BSD stock closed at a high of

$7.03, and by the end of June 2014, the stock closed at $0.99—a decrease of over eighty-five

---

[2] At all relevant times during the Investment Period and during the Dilution Events, BSD's
executives continued to collect aggregate salaries of almost half a million dollars and the Board
of Directors collected board fees in an aggregate of almost $200,000. Significantly, executive
compensation and board fees alone constituted almost ten percent (10%) of the "selling, general
and administrative" operating costs and expenses for the fiscal year 2013. The other costs and
expenses were allocated to research and development costs and expenses which, for a biomedical
company, was a mere $2,281,854.

percent (85%).  Since that time, the stock price has declined by an additional 65% to $0.34 per

share.



Comparatively, pursuant to the Vanguard Small Cap Growth Index Fund Admiral, the

**annualized return** from September 27, 2011 through March 31, 2015 on that fund was

+20.83%.

      59.     The Russell 3000 Index also reveals a significant increase over a similar period.



      60.     On or about August 13, 2014, BSD filed a Form 8-K with the SEC disclosing that

the Company faces potential delisting from the NASDAQ because on August 8, 2014, "the bid

price of the Company's common stock for the last 30 consecutive trading days had closed below the minimum $1.00 per share."

61.      On November 10, 2014, BSD announced that it named Mr. Clint Carnell as its new CEO and that his compensation included a $350,000 annual salary and a $150,000 annual bonus.  In addition, BSD's prior CEO would collect a severance of $275,000. While BSD's CEOs are being paid a total of $775,000, BSD's share price continues to plummet now trading at $.34 a share whereas it was trading at $1.30 this time last year. As a further benchmark of the significant depreciation of BSD's share price, on November 12, 2010, the stock closed at $7.03.

        2.      BSD's Representations to Plaintiff Were Materially Misleading

62.      Between November 2010 and Summer 2011, BSD issued multiple press releases representing that it was experiencing growth. For example, Dr. Damien Dupuy joined BSD's Board of Directors with BSD issuing a press release stating, "[w]e are excited to have Dr. Dupuy, an internationally recognized expert in interventional oncology, join our Board of Directors. His direction and experience will be invaluable to us for the expansion of our Company and of the MicroThermX Microwave Ablation line of products." BSD also represented that it was expanding its distributorship network, stating, it had entered into an exclusive distribution agreement with Classic Medical, Inc., a company that has a "20-year history of selling state-of-the-art surgical devices produced by some of the leading medical companies in the U.S.," and "has successful long-term relationships with physicians, key opinion leaders, and hospitals throughout the Southeastern U.S."

63.      Such representations, especially BSD's decision to hire Dupuy, not only encouraged Plaintiff to purchase BSD's stock, but similarly, to hold, rather than sell, his position.

64.      Although touting growth, after the first Dilution Event in November 2010, BSD's stock price continued to decline through summer 2011. As such, Plaintiff became deeply

concerned as to the viability of his investment and was at an impasse as to whether he should

buy, sell or hold. Accordingly, in or around summer 2011, Plaintiff contacted BSD via

telephone, specifically speaking with BSD's then-CEO Harold Wolcott aka "Butch".

65.     During the telephone call, Plaintiff told "Butch" in sum and substance that

because of the Dilution Event and decline in price, he had serious concerns about the future of

the company and needed to make an informed decision as to whether he should buy, sell or hold

his investment.

66.     Plaintiff sought confirmation from "Butch" of the information disclosed in BSD's

press releases concerning Dupuy, specifically asking if Dupuy maintained the capability to

market BSD's products to doctors around the world and whether or not medical professionals

would use BSD's equipment. Plaintiff also sought confirmation of the distributorships disclosed

in BSD's press releases.

67.     In response to Plaintiff's inquiries, Wolcott confirmed the expansion of BSD's

distribution network and represented that the company would experience growth as a result of

Dupuy being added to BSD's Board.

68.     Based on these representations and confirmations made to Plaintiff by BSD's

CEO, Plaintiff continued to invest and purchase additional shares of BSD.

> 3.     BSD's Representations Regarding Revenue and Sales Were Materially
> Misleading and Omitted Vital Facts

69.     On March 5, 2014, BSD filed its Form 10-K (the "March 2014 Form 10-K") for

the fiscal year ended August 31, 2013 with the SEC. The disclosures and financials reported

therein revealed that many of BSD's press releases and SEC filings were riddled with material

misstatements and omissions.

70.     For example, the March 2014 Form 10-K revealed that "the number of hyperthermia systems sold has decreased this year due to negative regulatory, economic and other healthcare industry factors." The 2013 press releases however touted that that a "major East Cost academic medical center . . . has purchased a BSD-500 Hyperthermia System . . . . The Center is launching an extensive new hyperthermia program to capitalize on the advantages provided by  hyperthermia treatment" and expansion in the Asian market "could total more than $26.0 million in revenue to BSD over a five year period."

71.     To date, upon information and belief, BSD has failed to disclose the identity of the East Coast academic center and the status of its "extensive hyperthermia program," and BSD has only shipped four known hyperthermia machines to Linden Bioscience Co., Ltd. (Linden) under the existing contract.

72.     The October 9, 2012 press release claiming a "391% increase in sales for the MicroThermX Microwave Ablation System product line for September 2012 as compared to September 2011" is a "dramatic increase in sales . . . and representative of a continuing trend of accelerating MicroThermX revenue" is materially misleading as it is indicative of only a one month over one month comparative period. One month of increased sales compared to the same month/prior year is not "representative of a continuing trend of accelerating revenue."

73.     The December 6, 2012 press release announcing "a 586% increase in sales for the MicroThermX Microwave Ablation System . . . for the fiscal quarter ended November 30, 2012, as compared to the fiscal quarter ended November 30, 2011," is materially misleading as it readily omits that this outstanding increase is a result of zero (0) MicroThermX machines being sold for the fiscal quarter ended November 30, 2011. Significantly, the Form 10-Q disclosing the actual sales figures for the fiscal quarter ended November 30, 2012, as compared to fiscal quarter

ended November 30, 2011, was released subsequent to the press release. As such, investors were lacking relevant data points and forced to rely upon this press release.

74.     Similarly, the press release dated February 26, 2013, reporting a "319% increase in sales of its MicroThermX Microwave Ablation System . . . during the first five months of fiscal 2013, when compared to the first five months of fiscal 2012," and "is indicative of the growing acceptance and use of MicroThermX products in the ablation market" is similarly inflammatory as it fails to disclose the actual number of machines sold. In fact, only three (3) MicroThermX machines were sold for the six-month period ended February 29, 2012. This press release also omits that only one (1) MicroThermX machine was sold for the fiscal quarter ended February 28, 2013, whereas three (3) MicroThermX machines were sold in the fiscal quarter ended February 29, 2012.

75.     The March 29, 2013 press release stating that Linden's "commitment to purchase an estimated $7.1 million in BSD product over a five year period, further validates [the] belief that the Hyperthermia business will **flourish** in Asia as regulatory approvals are secured" is materially misleading. (Emphasis added). $7.1 million in revenue over a period of five (5) years equates to sales of approximately four (4) machines per year. Such miniscule sales figures are not definitive of "flourishing."

76.     Then, on July 10, 2014, BSD issued a press release reporting a decrease in revenues "due primarily to the large number of MTX systems shipped in the prior year three month period following the signing of our MTX distribution partner in Europe . . ." Significantly, at a time when the Company was desperate for capital, namely April 2013, it released statements much to the contrary claiming that "[r]evenues from our agreement with Terumo Europe NV . . . are expected to make a substantial contribution to our overall revenue

over the next few years." At no point did BSD disclose the terms of the contract or that revenues associated therewith would be significantly frontloaded.

77.     The September 2014 investor and analyst presentation also represented substantial revenue growth of 105% (from fiscal 2012 to in-process fiscal 2014) that was materially misleading as it omitted revenue amounts for fiscal years 2007 through 2011—four of those five years showing revenue figures that were significantly greater than those of fiscal 2012. Furthermore, it stated that BSD was headed towards profitability, despite the fact that total revenue for the fiscal year was barely $5 million, and given the then-current and then-anticipated overhead and cost structure, the Company would need annual sales of approximately $20 million to break even, while there was no significant order backlog or evidence of customers submitting substantial repeat orders.

78.     On October 15, 2014,[3] BSD issued a press release stating, in relevant part,

BSD Medical Corporation . . . announced today that the company had signed an agreement with KOL Bio-Medical Instruments, Inc. (KOL) for the sales and distribution of BSD's MicroThermX Microwave Ablation (MicroThermX) line of products. KOL sales and distribution area will include up to 15 states in the Northeast, Mid-Atlantic and Southeast.

"This agreement with KOL fully expands our distribution network across the United States to include key states on the eastern seaboard, from Maine to Florida." Said Brian Ferrand, BSD Vice President of Domestic Sales. "KOL is a well-respected distributor that has solid and extensive relationships with interventional radiologists throughout the Eastern United States. Moreover, between our carefully selected mix of distributors and direct sales representatives, we **now** have full sales coverage throughout the entire United States."

(Emphasis added).

_____

[3] Despite the fact that on or about October 6, 2014, counsel for Mr. Schwartz sent the demand, BSD has continued to issue press releases containing significant omissions and/or misleading facts in an attempt to induce investors to purchase its stock and prop up the price.

Over two years ago, in a press release dated August 29, 2012, BSD previously represented that it had sales coverage throughout the United States. A reader of the August 29, 2012 press release would be misled to believe that BSD was, at that time, selling in Florida, New York, New Jersey and Philadelphia, whereas the October 12, 2014 press release indicated that BSD broke new ground into those areas more than two years later. Such statements constitute material misrepresentations and/or omissions.

79.     On January 13, 2015, BSD filed its Form 10-Q (the "January 2015 Form 10-Q") for the quarter ended November 30, 2014 with the SEC. The disclosures and financials reported therein also revealed that many of BSD's press releases and SEC filings were riddled with material misstatements and omissions.

80.     For example, the January 2015 Form 10-Q revealed that:

> Management believes the future success for the company currently will be from the commercialization of its MicroThermX product lines. **Commencing in the summer of 2013, the Company launched an effort to secure a transaction or transaction(s) relating to our hyperthermia products and technology, including, but not limited to, partnering or other collaborative agreements, a sale of assets and/or other strategic arrangements. To date, these efforts have been fruitless.** Hence, the Company is now seeking to either sell the assets related to the hyperthermia products in the very near future and/or discontinue manufacturing and selling hypothermia systems. Even if we are able to sell the assets related to our hyperthermia product line, we do not know how much we will receive for such sale, and we do not expect the proceeds from such sale will be material.

(Emphasis added).

81.     Prior to the filing of the January 2015 Form 10-Q, and after summer of 2013, BSD made materially misleading statements and omissions regarding its hyperthermia product line. Namely, in a September 29, 2014 press release, BSD failed to mention that it was siphoning off assets related to the hyperthermia product line, and instead materially misrepresented that hyperthermia revenue would be increasing, stating in relevant part, "we look forward to the

25

subsequent revenue opportunities this will yield for our product in the world's largest end-market for hyperthermia. Orientech is committed to increasing the number of BSD-2000 systems installed in China."

82.     The September 29, 2014 press release also materially misrepresented that "BSD has a long-term exclusive distributor agreement with Orientech. The agreement requires Orientech to make yearly minimum purchases of the BSD-2000 over a four year period commencing upon receipt of the marketing and import license renewal." BSD cannot conceivably "discontinue manufacturing and selling hyperthermia products" if it entered into a four year contract requiring minimum purchases of the BSD-2000.

83.     At all relevant times during the Investment Period, BSD and its executives and directors had inherent knowledge of BSD's true financial condition and hard sales figures, yet willfully released materially misleading statements to entice investment.

4.     Defendants Fail to Conduct a Reasonable Investigation in Good Faith

84.     Based on the foregoing events, on or about August 13, 2014, Plaintiff sent a letter to BSD summarizing concerns he had with, among other things, BSD's dismal corporate performance and nefarious market activities in violation of the common law and securities laws. The letter also requested a teleconference to discuss Plaintiff's concerns.

85.     On August 20, 2014, BSD responded stating that Plaintiff had not provided sufficient information and refused to participate in any teleconference.

86.     On September 3, 2014, Plaintiff responded reiterating his request to meet with the Company.

87.     On October 6, 2014, as a result of the Company's refusal to respond to Plaintiff, Plaintiff made a demand upon the Board of Directors (the "Derivative Demand"). The demand attached a draft complaint detailing BSD's securities and common law violations.

88.     On October 17, 2014, Plaintiff sent a subsequent letter to the Derivative Demand and draft complaint as BSD had once again failed to respond. This letter requested: (1) whether BSD had commenced an investigation into the allegations in the draft complaint; (2) if the investigation had commenced; (3) the identity of the parties conducting the investigation; and (4) the anticipated duration of the investigation. The letter also made a demand for the Company to respond in ten business days.

89.     On October 29, 2014, BSD responded with a four sentence letter stating, in relevant part, that the Board had already commenced an investigation regarding the allegations in the draft complaint and it had elected to hire, but had not yet hired, outside counsel to assist it in its investigation. The Board's alleged anticipated time frame for the investigation was at least 90 to 120 days to completion.

90.     On November 14, 2014, Plaintiff sent BSD a letter that, among other things, expressed concern with: (1) the unreasonably long timeline anticipated by Defendants' counsel to conclude the investigation; (2) the fact that the investigation had already commenced even though independent counsel had not yet been retained; (3) the parameters of the investigation and who at the Company had set such parameters; (4) BSD's significant amount of executive compensation; and (5) the continued violations of securities laws as BSD failed to disclose the threatened derivative action in the November 2014 Form 10-K for the fiscal year ended August 31, 2014.  Moreover, the letter demanded a more substantive response than that which was provided in the October 29, 2014 letter.

91.     On November 26, 2014, BSD sent Plaintiff yet another response that failed to substantively respond to his requests and concerns. Instead, BSD refused to meet with Mr. Schwartz rather stating that it will interview him regarding his allegations but "will not be

consulting with [counsel] or [Mr. Schwartz] as the investigation progresses." Moreover, and significantly, the letter also states that "the parameters and content of the investigation will be determined by the BSD Medical Board of Directors." This fact wholly undermines the credibility of any purported investigation as such investigation should be impartial and conducted by outside special counsel. BSD also reiterated that a reasonable time for the investigation would be "approximately 90 to 120 days."

92.     On January 20, 2015, Plaintiff sent BSD an email reminding it that despite the 90 day window fast approaching, Plaintiff had yet to receive any communication from BSD or its special counsel seeking an interview or any further documentation from Plaintiff. Plaintiff also expressed concern that, among other things, BSD did not disclose in its Form 10-Q filed on or about January 13, 2015, that a material risk of litigation existed.

93.     On or about January 23, 2015, BSD responded by denying any stall and delay in the investigation. Further, despite this denial, BSD failed to: (1) schedule an interview with Plaintiff; (2) address Plaintiff's concerns regarding BSD's recent 10-Q filing which omitted that a material risk of litigation existed; and (3) disclose any substantive information regarding the purported investigation.

94.     In response, on January 23, 2015, Plaintiff inquired into the continued concealment of the purported investigation from shareholders.

95.     On January 29, 2015, after receiving no response to the January 23, 2015 inquiry, Plaintiff sent a follow up email to BSD. In this email Plaintiff again inquired into the continued concealment of the material risk of litigation. The email also reiterated that Plaintiff had yet to be contacted by BSD's special counsel, Holland & Hart, in connection with the purported investigation.

96.     On February 13, 2015, two weeks after Plaintiff's last correspondence, and four months (*i.e.* more than 120 days) after the Derivative Demand was served, BSD's special counsel finally contacted Plaintiff. BSD's special counsel sought to acquire documents and schedule an interview with Plaintiff for the final week of February 2015. BSD's counsel however did not address the substance of its investigation nor did it address BSD's concealment of the material risk of litigation to its shareholders.

97.     On February 18, 2015, Plaintiff confirmed availability for an interview the week of March 2, 2015, and suggested an in-person meeting.

98.     On February 20, 2015, Plaintiff sent BSD's special counsel (and its litigation counsel) an email, among other things, detailing newly discovered misrepresentations and omissions—namely, misrepresentations in recent press releases and SEC filings regarding revenue opportunities related to BSD's hypothermia products. Plaintiff also reiterated his request for an in person meeting the week of March 2, 2015.

99.     Subsequently, on February 20, 2015, BSD's special counsel sent a letter regarding scheduling Plaintiff's interview for the week of March 2, 2015—they however declined Plaintiff's request for an in-person meeting. The letter similarly did not address the recent misrepresentations made by BSD as detailed in Plaintiff's previous email.

100.    On February 24, 2015, the parties agreed that BSD's special counsel's interview of Plaintiff would occur *via* telephone on March 4, 2015. BSD's special counsel also disclosed that BSD's Board members Mr. Steven Stewart and Mr. Tim McQuay would be participating in the interview as they had "been designated by the BSD Medical Board of Directors to conduct [the] investigation." Mr. Steven Stewart and Mr. Tim McQuay are named defendants herein.

101.    On March 4, 2015, Plaintiff attempted to participate in the interview by BSD's special counsel and designated Board members. However, the call was ended by BSD after it was discovered that there were significant deficiencies in the purported investigation. For example, at the beginning of the conference call, BSD's special counsel revealed that it had not been conducting its investigation with a full record. Not only did BSD's special counsel and designated Board members attempt to interview Plaintiff with a partial record, but it had already interviewed a majority of the Defendants with an incomplete record. BSD's special counsel stated that he would email Plaintiff's attorney copies of all communication documents between Plaintiff's and Defendants' counsel—for the purpose of establishing that it was performing a complete, thorough, diligent and competent investigation—but it failed to do so. Such deficiencies portray the biased nature of BSD's special counsel's purported investigation and the flippance by which the Defendants addressed Plaintiff's complaint.

102.    During the conference call, BSD's special counsel even concluded that BSD was a "caring and considerate company", despite not having interviewed the Plaintiff and having conducted an incomplete investigation.

103.    Further, BSD's special counsel made the affirmative representation that it was independent and did not have any affiliation to BSD and/or its litigation counsel, Dorsey and Whitney. After Plaintiff confronted BSD regarding the veracity of its independence from BSD and/or Dorsey and Whitney, BSD's special counsel promptly ended the call.

104.    On March 5, 2015, Plaintiff sent BSD and its special counsel an email memorializing the deficiencies with the purported investigation as discovered during the March

4, 2015 interview and questioned the veracity of the investigation. For example, a partner at

Holland & Hart LLP serves on the same charity board as BSD's Vice President of Engineering.[4]

105.    On March 10, 2015, because Plaintiff did not receive a response to his March 5,

2015 correspondence, Plaintiff sent a follow up email to BSD and its special counsel seeking

advisement on how it intended to cure the glaring problems with its biased and ill-informed

investigation.

106.    On March 13, 2015, BSD's special counsel rejected Plaintiff's characterization of

the investigation undertaken by BSD's Board and requested new dates to interview Plaintiff.

107.    Based on the foregoing, Defendants failed to conduct an independent, reasonable

investigation in good faith into the claims set forth in the Derivative Demand and Plaintiff's

correspondence. Among other things, Defendants' investigation was biased because it was

conducted by named defendants, it did not consider all communications between Plaintiff's and

Defendants' counsel and its special counsel was found to be directly affiliated with a high

ranking employee at BSD.

108.    Moreover, Defendants failed to conduct a *timely*, independent, reasonable

investigation in good faith. Plaintiff's first correspondence with BSD was in August 2014, and

his Derivative Demand was served on October 6, 2014. Not only did Defendants fail to meet

their own (and unreasonable) 90 to 120 day deadline for the purported investigation, but more

than six months have passed since BSD was served with the Derivative Demand.

---

[4] Todd Turnlund is BSD's Vice President of Engineering and maintains options to purchase
275,000 shares of common stock. Mary York is a partner at Holland & Hart LLP. Mr. Turnlund
and Ms. York both serve on the JDRF Utah Chapter Board.

109.     On April 20, 2015, eight months after Plaintiff's initial correspondence with BSD, and without ever conducting an interview with Plaintiff,  BSD sent Plaintiff's counsel a letter stating,

> That the investigation has been substantially completed, and special counsel has advised BSD's Board of Directors of its recommendations. Based on the Board and its Special counsel's investigation, and exercising its business judgment, the Board of Directors has determined [Mr. Schwartz's] claims are unfounded and entirely without merit. The Board of Directors has determined that pursuing [Mr. Schwartz's] claims is not in the Company's best interest

5.     BSD's Representations Regarding Legal Proceedings Were Materially Misleading and Omitted Vital Facts

110.     Despite being in possession of the Derivative Demand and related correspondence, BSD chose to make material misrepresentations and omissions regarding the Company's legal proceedings in multiple SEC filings.

111.     On November 13, 2014, BSD filed its Form 10-K for the fiscal year ended August 31, 2014 ("November 2014 Form 10-K"). Significantly, on page 31 of the November 2014 Form 10-K, Item 3. Legal Proceedings, the Company states that, "There are no material legal proceedings, to our knowledge, pending against or being taken by us."  BSD was in receipt of the Derivative Demand at the time the November 2014 Form 10-K was filed.

112.     On January 14, 2015, BSD filed its 10-Q for the quarter ended November 30, 2014 ("January 2015 Form 10-Q"). The January 2015 Form 10-Q also omitted that legal action was threatened against BSD.

113.     On January 15, 2015, BSD's CEO Clint Carnell stated during an investor conference call, "I'll do my best to provide transparency so that you can understand how to invest in the company and follow our progress."  Mr. Carnell failed to disclose the Plaintiff's threatened litigation.

114.    On March 31, 2015, BSD filed a Form 10-K For the Transition Period From

September 1, 2014 to December 31, 2014 ("March 2015 Form 10-K"), directly contradicting the

November 2014 Form 10-K and January 2015 Form 10-Q,  disclosing that there were indeed

material legal proceedings pending, stating:

> We are subject to various complaints, allegations and threats of lawsuit in the ordinary course of business.  We do not believe that any of the current complaints or allegations has merit, nor will have a material impact on our business or financial condition. However, complaints, allegations and threats of lawsuits are deemed serious, divert resources and could result in the payment of substantial damages. Legal counsel for BSD received a demand letter dated October 3, 2014 and a draft complaint from a single shareholder's legal counsel who threatened a direct, derivative and securities class action suit against BSD, as well as all current and certain former directors and officers.  The unfiled draft complaint alleges that from November 2010 through October 2014, BSD issued various press releases and public statements which omitted certain material facts related to BSD's revenue and sales, thereby misrepresenting the true financial condition of BSD.  In particular, the draft complaint alleges that BSD's press releases "tout[ed] impressive revenue figures and purported sales" when "in reality BSD was floundering and unable to cover its operating costs, including significant executive compensation."  The unfiled draft complaint also alleges that BSD "chose to issue additional securities at below-market prices in an effort to fund operating expenses," rather than "raise capital through debt transactions or other methods," and that three offerings cited in the draft complaint resulted in "the dilution of existing shareholder positions."  Our Board of Directors has engaged outside legal counsel specializing in securities matters and litigation to conduct an independent investigation of this draft complaint and its allegations.  Upon completion of their investigation by special legal counsel, we expect findings and recommendations will be presented to the Board of Directors for its consideration.

115.    The March 2015 Form 10-K was the first time during the Investment Period that

BSD had indicated, prior to an offering, that "[w]e believe additional funding will be required . .

. ." BSD's prior decisions to conceal such information constituted flawed and dishonest

communications with its shareholder base.

116.    BSD's March 2015 Form 10-K's legal proceedings disclosure states, in relevant

part, "[w]e do not believe that any of the current complaints or allegations has merit, nor will

have a material impact on our business or financial condition." This statement constitutes a

material misrepresentation because BSD lacked a sufficient basis to form this belief as BSD and

BSD's special counsel had yet to conclude its purported investigation at the time the 10-K was

filed with the SEC.

117.    At all relevant times during the Investment Period, BSD and its executives and

directors had inherent knowledge of the Derivative Demand and Plaintiff's correspondence

regarding the Company's material representations and omissions, yet willfully released

materially misleading statements to entice investment.

6.      BSD's Actions in the Wake of the Derivative Demand

118.    After the Derivative Demand was served, and during the purported investigation

by BSD and its special counsel, BSD amended the forward looking statement disclosures

contained in the Company's SEC filings and press releases. Whereas BSD's prior forward

looking statement disclosures were boiler plate, BSD's current forward looking statement

disclosures are drafted with much greater specificity.

119.    After the Derivative Demand was served, and during the purported investigation

by BSD's special counsel, two of BSD's directors resigned from the Board.

120.    Specifically, on or about February 9, 2015, four (4) days before BSD finally

sought to schedule an interview with Plaintiff, BSD issued a press release announcing: "the

resignation of Gerhard W. Sennewald, Ph.D., and Douglas P. Boyd, Ph.D., as members of the

Board of Directors. Mr. Boyd's resignation was effective on January 28, 2015 and Mr.

Sennewald's resignation was effective February 4, 2015."

121.    As a result of his board resignation, Boyd also ceased immediately to be the

chairman of the Company's Compensation Committee and a member of the Company's Audit

Committee and Corporate Governance and Nominating Committee.

122.    Prior to the Derivative Demand, Sennewald had served on BSD's Board for 11 years; Boyd had served 10 years on the Board.

123.    Sennewald and Boyd are named defendants herein.

124.    According to BSD, Sennewald's and Boyd's resignations were voluntary.

125.    After the Board resignations, on February 24, 2015, BSD then filed an 8-K with the SEC, stating, in relevant part: "Effective February 20, 2015, Perseon Corporation (the "Company") amended its certificate of incorporation to change its legal corporate name to 'Perseon Corporation' from 'BSD Medical Corporation.'"

126.    On February 24, 2015, BSD also issued a press release stating, in relevant part,

"The change of our name to Perseon, a word with multiple references to our mission and technology, succinctly represents our focus as a pure play microwave ablation company with a market leading product platform," said Clint Carnell, CEO of Perseon.  "Perseon is a truly authentic and memorable name that will resonate with our customers and peers and clearly defines our purpose – to ablate, or 'destroy,' diseased soft tissue (tumors).  The launch of our new name and identity is the first in a series of rebranding initiatives that will support our goals in marketing and education, peer-to-peer influence and clinical-based, product innovation, all of which are essential to our future success in life sciences.  We are excited about our momentum and will be sharing more about our new company in the weeks and months ahead."

127.    The February 24, 2015 press release states that the name change "represents our focus as a pure play microwave ablation company with a market leading product platform."  This statement is in direct conflict with: (1) BSD's September 29, 2014 press release, stating "[w]hile this was a long and difficult process, we are very excited that the process is now complete, and we look forward to the subsequent revenue opportunities this will yield for our product in the world's largest end-market for hypothermia. Orientech is committed to increasing the number of BSD-2000 systems installed in China."; and (2) BSD's 10-K filed on November 13, 2014, stating, "[o]ur current corporate strategy includes the possibility of entering into additional

collaborative arrangements with third parties to expand and improve the commercialization of all

our products, including our hyperthermia systems."

128.    On March 3, 2015, the day before Plaintiff's interview, BSD issued a press

release disclosing that, "that its Board of Directors is exploring strategic options to enhance

shareholder value.  The Board has retained SunTrust Robinson Humphrey as its financial advisor

to assist in this important initiative for the Company."

129.    On April 1, 2015, BSD filed Form 8-K ("April 2015 8-K") revealing that

subsequent to the Sennewald and Boyd resignations, the Company engaged in a fraudulent

transfer of assets to Sennewald and Boyd. Specifically, The April 2015 8-K indicated, in relevant

part, that the Company:

> sold the assets associated with its hyperthermia cancer treatment systems,
> including among other assets, certain contracts, inventory, intellectual property,
> and permits (the "Acquired Assets") pursuant to an Asset Purchase Agreement
> (the "Purchase Agreement") with Pyrexar Medical Inc., a Nevada corporation (the
> "Buyer"). As consideration for the Acquired Assets, the Company received (i)
> 19.9% of the Series A Preferred Stock of the Buyer (the "Preferred Stock") and
> (ii) a percentage of the gross revenues the Buyer receives from its sale of
> hyperthermia cancer treatment systems. The Buyer also assumed certain liabilities
> associated with the Acquired Assets. The Purchase Agreement contains
> customary representations, warranties and covenants of the Company and the
> Buyer. Subject to certain limitations, the Company has agreed to indemnify the
> Buyer for breaches of representations, warranties, covenants and retained
> liabilities.  The Purchase Agreement also provides that the parties shall enter into
> a lease agreement, pursuant to which the Company will lease to the Buyer a
> portion of the Company's facility at 2188 West 2200 South, Salt Lake City.  Base
> Rent under the lease agreement is set at approximately $96,660 per year. Each
> share of Preferred Stock the Company received is convertible for one share of
> common stock of Buyer subject to adjustment in the event of stock splits, stock
> dividends and other similar events, and the Company received voting rights equal
> to those of holders of Buyer's common stock. The Company is also entitled to
> cumulative annual dividends of $0.015 per share commencing April 1, 2016. In
> the event of certain liquidation events, we are entitled to receive, prior to any
> distribution to holders of other shares of capital stock of Buyer, a liquidation
> preference of approximately $2 million. Buyer is prohibited without the
> Company's consent from authorizing, creating or issuing any other equity security
> having priority over the Preferred Stock. Two former directors of the Company,

Dr. Gerhard W. Sennewald and Douglas P. Boyd have a financial interest in Buyer. In light of the Company's relationship with Buyer, the Company received a fairness opinion from Houlihan Valuation Advisors that the consideration it received for the Acquired Assets is fair to the Company from a financial perspective.

130.    Not only were BSD's assets[5] transferred to a related party, but they were transferred for consideration that brought no liquidity to the Company—*i.e.* stock in a company that began operating on April 2, 2015, and is operated by former BSD executives and directors including Boyd, Sennewald[6], and Turner. Indeed, the April 2015 8-K does not indicate that there was any cash paid up front by Pyrexar Medical Inc. for the assets received, and indicates that a fairness opinion was provided by Houlihan Valuation Advisors, despite the fact the newly formed Pyrexar has no track record, and there may never be a market for its common stock.

131.    Furthermore, the assets transferred by BSD to Pyrexar Medical Inc., namely the BSD-2000 inventory and related contracts for sale and customer list, had generated millions of

---

[5] BSD's fraudulent transfers to Pyrexar Medical Inc. are not limited to hard assets. Sennewald, Pyrexar's President and Director, has been acquiring BSD's hard assets and intangible assets for some time. According to the March 2015 Form 10-K, "Dr. Sennewald, a former director and one of our significant stockholders, is a stockholder, executive officer and a director of Medizintechnik." As had been disclosed throughout the years, Medizintechnik previously purchased and distributed many of BSD's BSD-2000 hyperthermia machines. Further, pursuant to Pyrexar Medical Inc.'s April 2, 2015 press release, "With the acquisition of BSD Medical assets, Pyrexar Medical takes its place as pioneer and worldwide market leader in the development and manufacture of innovative and highly effective hyperthermia treatment systems with established distribution and support networks in the US, Europe and Asia. PYREXAR HyperThermia (PYREXAR HT) treatments increase the effective dose of ionizing radiation in solid tumors up to 3X without increasing toxicity of healthy tissues. Multi-center clinical trials in the US, Europe and Asia over the past 30 years document dramatic improvement in survival rates when PYREXAR HT is combined with radiotherapy in the treatment of chest wall recurrences after breast cancer, locally advanced cervical cancer, high risk soft tissue sarcoma, melanoma and other malignancies."

[6] Considering Sennewald resigned from the Board a week after the term sheet had been submitted, it is apparent that this transaction was not performed at arm's length. Sennewald was undoubtedly involved in the negotiation of the asset transfer while still held out as a fiduciary of BSD.

dollars in annual revenue and gross profit in each year of the Investment Period, and for many years prior.[7]  Although BSD incurred substantial and recurring losses each year, those losses would have been even greater if not for the gross profit derived from the sales of the BSD-2000. The annual revenue from the BSD-2000 far exceeded that of the MicroThermX Microwave Ablation System (MTX-180).

132.    Based on the foregoing, any prophylactic measures taken by BSD are transparent. At all relevant times during the Investment Period, Defendants had inherent knowledge of BSD's true financial condition and hard sales figures, the Derivative Demand, and Plaintiff's correspondence regarding the Company's material representations and omissions, yet willfully released materially misleading statements to entice investment.

## V.     NO SAFE HARBOR PROTECTION

133.    The statutory safe harbor for certain forward-looking statements does not apply to the misrepresentations and omissions alleged in this Complaint.

134.    The statements complained of herein were not forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about BSD's financial results and sales figures, among others.

---

[7] BSD purported to have developed the most advanced hyperthermia equipment (the BSD-2000) in the world, with many clinical trials conducted at prestigious universities which were published in leading peer-reviewed journals, and they had successfully sold and installed this equipment in cutting-edge hospitals throughout Europe.  In addition, BSD had obtained government approval to sell, and had begun to sell, the BSD-2000 in China and Taiwan (and was awaiting government approval to sell in South Korea) with contracts in place guaranteeing sales of no fewer than 85 (eighty-five) BSD-2000 machines, selling for prices ranging from several hundred thousand dollars to over $1 million per machine, depending on design options, at substantial gross margins.  In a July 2014 investor call, then-CEO Harold Wolcott spoke of several different billion dollar companies in  discussion with BSD for partnerships that would change the way the BSD-2000 was distributed.

135. Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as BSD's Forms 10-K and 10-Q issued through the Investment Period.

136. To the extent that the financial statements contained any properly identified forward-looking statements, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable nonetheless because at the time each of the misrepresentations was made, the particular speaker(s) knew that the statement was materially false or misleading, or the forward-looking statement was authorized and/or approved by an executive officer or director of BSD who knew that the statement was materially false and misleading when made.

## VI. CONTROL PERSON ALLEGATIONS

137. By virtue of the Executive Defendants' and Director Defendants' positions of management and control within the Company, they had access to undisclosed adverse information about BSD, its operations and financial condition. Upon information and belief, the Executive Defendants and Director Defendants acquired such information through BSD's internal corporate documents, conversations, connections with each other and with corporate officers and employees, and attendance at Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as BSD officers and/or directors.

138. The Executive Defendants and Director Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and knew, or recklessly disregarded, that there were

material misstatements and omissions contained therein. Because of their Board and/or executive and managerial positions at BSD, Executive Defendants and Director Defendants had access to the adverse undisclosed information and BSD's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about BSD and its business or adopted by the Company materially false and misleading.

139.    The Executive Defendants and Director Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Investment Period. Upon information and belief, the Executive Defendants and Director Defendants either signed or were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, both Executive Defendants and Director Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

140.    As officers, directors, and controlling persons of a publicly-held company whose common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the NASDAQ, and governed by the provisions of the federal securities laws, Executive Defendants and Director Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate

information. The Executive Defendants' and Director Defendants' material misrepresentations

and omissions during the Investment Period violated these specific requirements and obligations.

## VII.    CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder Against BSD

141.    Plaintiff incorporates by reference and realleges each and every allegation

contained above as if fully set forth herein.

142.    During the Investment Period, officers, management and agents of BSD carried

out a plan, scheme and course of conduct which was intended to and, through the Investment

Period, did: (i) deceive the investing public regarding BSD's operations, financial condition, and

the intrinsic value of BSD's common stock; and (ii) enable BSD to manipulate the price of

BSD's common stock. In furtherance of this unlawful scheme, plan, and course of conduct, BSD

took the actions set forth herein.

143.    Officers, management, and agents of BSD directly and indirectly, by the use of

means of instrumentalities of interstate commerce, the mails, and/or the facilities of a national

securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue

statements of material fact and/or omitted material facts necessary to make the statements not

misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud

and deceit upon all of the purchasers of the Company's stock in an effort to entice investment in

violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

144.    Officers, management, and agents of BSD employed devices, schemes and

artifices to defraud while in possession of material adverse non-public information and engaged

in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of

BSD's value and performance, which included the making of untrue statements of material facts

41

and omitting material facts necessary in order to make the statements made about BSD's operations and financial condition, not misleading as set forth more particularly herein. Officers, management, and agents of BSD did not have a reasonable basis for the alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon all of the purchasers of BSD common stock, including Plaintiff.

145.     BSD is liable for all materially false and misleading statements and omissions made during the Investment Period, as alleged above, including the false and misleading statements and omissions included in its Form 8-K, 10-Q and 10-K filings.

146.     BSD is further liable for the false and misleading statements made by BSD's officers, management, and agents in press releases and during conference calls, as the maker of such statements and under the principles of agency and respondeat superior.

147.     In addition to the duties of full disclosure imposed on BSD, as a result of the affirmative statements and reports made by its officers, management, and agents, or participation in the making of their affirmative statements and reports to the investing public, BSD had a duty to promptly disseminate truthful information that would be material to investors, in compliance with GAAP and the integrated disclosure provisions of the SEC, including truthful, complete and accurate information with respect to the Company's operations and financial condition, so that the Company's share price would be based on truthful, complete and accurate information.

148.     The allegations above establish an indisputable inference that BSD, as an entity, acted with corporate scienter throughout the Investment Period, as its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material

misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing BSD's true operating condition from the investing public.

149.     As a result of his reliance, directly or indirectly on the false and misleading statements and omissions made by BSD, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by BSD but not disclosed in public statements by BSD during the Investment Period, Plaintiff acquired and held BSD stock and has been damaged by the dramatic and continual decrease in share price.

150.     At the time of said misrepresentations and omissions, Plaintiff was unaware of their falsity, and believed them to be true. Had Plaintiff and the marketplace known of the truth concerning BSD's operations and financial condition, which were not disclosed by BSD, Plaintiff's investment strategy would have differed significantly.

151.     By virtue of the foregoing, BSD has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

152.     As a direct and proximate result of BSD's wrongful conduct, Plaintiff individually and on behalf of the Company suffered substantial damages with respect to his purchase of BSD stock.

## COUNT II
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Executive Defendants and Director Defendants

153.     Plaintiff incorporates by reference and realleges each and every allegation contained above as if fully set forth herein.

154. During the Investment Period, the Executive Defendants and Director Defendants carried out a plan, scheme and course of conduct which was intended to and, through the Investment Period, did: (i) deceive the investing public regarding BSD's operations, financial condition, and the intrinsic value of BSD's common stock; and (ii) enable BSD to manipulate the price of BSD's common stock. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

155. The Executive Defendants and Director Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon all of the purchasers of the Company's stock in an effort to artificially manipulate the price of BSD stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The Executive Defendants and Director Defendants are each sued as primary participants in the wrongful and illegal conduct charged herein.

156. In addition to the duties of full disclosure imposed on the Executive Defendants and Director Defendants as a result of their affirmative statements, the Executive Defendants and Director Defendants had a duty to promptly disseminate truthful information that would be material to investors, in compliance with GAAP and the integrated disclosure provisions of the SEC, including truthful, complete and accurate information with respect to the Company's operations and financial condition so that the Company's share price would be based on truthful, complete and accurate information.

157. The Executive Defendants and Director Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the

mails, engaged and participated in a continuous course of conduct to conceal adverse material information about BSD's operations and financial condition as specified herein.

158.    The Executive Defendants and Director Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BSD's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make the statements about BSD's operations and financial condition true, as set forth more particularly herein. The Executive Defendants and Director Defendants additionally engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiff as a purchaser and holder of BSD common stock during the Investment Period.

159.    The Executive Defendants' and Director Defendants' primary liability, and controlling person liability, also arises from the following facts: (i) the Executive Defendants and Director Defendants were high-level executives and/or directors of BSD during the Investment Period and members of BSD's management team or had control thereof; (ii) the Executive Defendants and Director Defendants enjoyed significant personal contact and familiarity with and had access to members of BSD's management team, internal reports, and other data and information about BSD's operations and financial condition, at all relevant times; and (iii) both the Executive Defendants and Director Defendants were aware of BSD's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

160.    The Executive Defendants and Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless

disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Executive Defendants' and Director Defendants' material misrepresentations and/or omissions were made knowingly or recklessly and without reasonable basis for the purpose and effect of concealing BSD's true operating condition from the investing public. By making material misrepresentations and concealing material facts from investors, BSD sought to entice investors to continue to invest and remain invested in the Company.

161.     In ignorance of the fact that BSD's share price had been manipulated, and relying directly or indirectly on the false and misleading statements and omissions made by the Executive Defendants and Director Defendants or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Executive Defendants and Director Defendants but not disclosed in public statements by the Executive Defendants and Director Defendants during the Investment Period, Plaintiff acquired and held BSD stock during the Investment Period at manipulated prices and was damaged accordingly.

162.     At the time of said misrepresentations and omissions, Plaintiff was unaware of their falsity, and believed them to be true. Had Plaintiff and the marketplace known of the truth concerning BSD's operations and financial condition, which were not disclosed by the Executive Defendants and Director Defendants, Plaintiff would have pursued a significantly different investment strategy.

163.     By virtue of the foregoing, the Executive Defendants and Director Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

164.     As a direct and proximate result of the Executive Defendants' and Director

Defendants' wrongful conduct, Plaintiff individually and on behalf of the Company suffered

substantial damages with respect to his purchase of BSD stock.

**COUNT III**
**Violation of the Section 20(a) of the Exchange Act**
**against the Executive Defendants and the Director Defendants**

165.     Plaintiff incorporates by reference and realleges each and every allegation

contained above as if fully set forth herein.

166.     The Executive Defendants and Director Defendants acted as controlling persons

of BSD within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of

their executive positions, participation in and/or awareness of the operations and financial

condition, the Executive Defendants and Director Defendants had the power to influence and

control, and did influence and control, directly or indirectly, the decision-making of the

Company, including the content and dissemination of the various statements that Plaintiff

contends are false and misleading. The Executive Defendants and Director Defendants were

provided with or had unlimited access to copies of the Company's reports, press releases, public

filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or

cause the statements to be corrected.

167.     In particular, the Executive Defendants and Director Defendants had direct and

supervisory involvement in the day-to-day operations of the Company and, therefore, are

presumed to have had the power to control or influence the particular transactions giving rise to

the securities violations as alleged herein, and exercised same.

47

168.     As set forth above, BSD, the Executive Defendants and Director Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Executive Defendants and Director Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Executive Defendants' and Director Defendants' wrongful conduct, Plaintiff individually and on behalf of the Company suffered substantial damages in connection with his purchases of the Company's common stock during the Investment Period.

### COUNT IV
**Fraud against the Executive Defendants and the Director Defendants**

169.     Plaintiff incorporates by reference and realleges each and every allegation contained above as if fully set forth herein.

170.     Plaintiff states that BSD, the Executive Defendants, and Director Defendants made the aforesaid misrepresentations and omissions willfully and with actual knowledge of their falsity in an attempt to induce market participants such as Plaintiff to invest in the Company and to support the artificially manipulated stock prices.

171.     In ignorance of the fact that BSD's share price had been manipulated, and relying directly or indirectly on the false and misleading statements and omissions made by BSD, the Executive Defendants, and Director Defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by BSD, the Executive Defendants, and Director Defendants, but not disclosed in public statements by BSD during the Investment Period, Plaintiff purchased or acquired BSD stock during the Investment Period at manipulated prices and was damaged accordingly.

172.    At the time of said misrepresentations and omissions, Plaintiff was unaware of their falsity, and believed them to be true. Had Plaintiff, and the marketplace, known of the truth concerning BSD's operations and financial condition, which were not disclosed by the Executive Defendants and Director Defendants, Plaintiff would have implemented a significantly different investment strategy.

173.    Plaintiff further states that after being served with the Derivative Demand, the Company engaged in a fraudulent transaction wherein it conveyed one of its primary assets to a related party for insufficient consideration. The conveyance of BSD's hyperthermia assets to a very recently formed company comprised of BSD's former directors and officers, in consideration for common stock lacking an established market, is detrimental to the company and its investor base at large.

174.    As a direct and proximate result of BSD's, the Executive Defendants', and Director Defendants' wrongful conduct, Plaintiff individually and on behalf of the Company has suffered substantial damages with respect to his purchase of BSD stock.

**COUNT V**
**Breach of Fiduciary Duties against the**
**Executive Defendants and the Director Defendants**

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above as if fully set forth herein.

176.    At all times relevant to the subject matter of this Complaint, the Executive Defendants and Director Defendants maintained a fiduciary duty to the Company and its shareholders that all business decisions would be made in good faith, with the care that a reasonably prudent person would use, and with the reasonable belief that they are acting in the best interests of the corporation.  This duty included the duty to direct the affairs of BSD in good

faith and in a prudent, efficient and honest manner; insure that capital was raised in good faith and in a prudent, efficient and honest manner; insure that capital was expended in good faith and in a prudent, efficient and honest manner; and the duty to affirmatively disclose to Plaintiff the true financial condition of the Company.

177.    Moreover, BSD and the Director Defendants maintained a fiduciary duty to the Company and its shareholders to conduct an unbiased, timely, reasonable investigation in good faith into the allegations set forth in the Derivative Demand and correspondence related thereto.

178.    BSD, Executive Defendants and Director Defendants knowingly, willfully and intentionally breached each of the aforesaid duties and as a direct and proximate result of said breach, Plaintiff individually and on behalf of the Company has suffered substantial damages in an amount to be determined at trial.

**COUNT VI**
**Negligence and/or Gross Negligence against the**
**Executive Defendants and the Director Defendants**

179.    Plaintiff incorporates by reference and realleges each and every allegation contained above as if fully set forth herein.

180.    The Director Defendants and Executive Defendants owed duties of reasonable care to the Plaintiff and BSD's shareholders.

181.    The Director Defendants and Executive Defendants knowingly and willfully breached their duties of reasonable care to the Plaintiff and BSD's shareholders.

182.    The Director Defendants' and Executive Defendants' breaches of their duties of reasonable care were the actual and proximate cause of damages to the Plaintiff.

183.     Plaintiff individually and on behalf of the Company was damaged as a result of the Director Defendants' and Executive Defendants' breaches of their duties of reasonable care in an amount to be determined at trial.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)     awarding compensatory damages in favor of Plaintiff individually and on behalf of the Company against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

(b)     awarding Plaintiff reasonable costs and expenses in this litigation, including attorneys' fees and experts' fees and other costs and disbursements; and

(c)     awarding Plaintiff such other and further relief as the Court may deem just and proper.

## IX.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

**Respectfully submitted,**

**WOMBLE CARLYLE SANDRIDGE
   & RICE, LLP**

Dated:  April 29, 2015

*/s/ Kevin J. Mangan*_____
Kevin J. Mangan (Del. Bar No. 3810)
Jill Agro (Del. Bar No. 4629)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330
Email:  kmangan@wcsr.com
Email:  jagro@wcsr.com

*Attorneys for Plaintiff Paul Schwartz*

*Of Counsel:*

David Graff
Anderson Kill, P.C.
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 278-1000
Facsimile:  (212) 278-1733

## VERIFICATION

STATE OF NEW YORK     )
                               )   SS.
COUNTY OF NEW YORK  )

Paul Schwartz hereby affirms under penalty of perjury as follows:

1.     I am the plaintiff in the above-captioned action. I have read the foregoing Complaint for and the facts recited therein are true and correct to the best of my knowledge, information, and belief. I have authorized the filing of the Complaint.

_____
Paul Schwartz

AFFIRMED TO AND SUBSCRIBED before
me this 29th day of April 2015.

_____
Notary Public

KATHLEEN M. O'NEILL
Notary Public, State of New York
No. 01ON-4687093
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires September 30, 2017

53