# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PAUL SCHWARTZ, individually as a          :
shareholder of Perseon Corporation (f/k/a   :
BSD Medical Corporation), and on behalf   :
of Perseon Corporation (f/k/a BSD Medical :
Corporation),                             :
                                             :

        Plaintiff,                        :
                                             :

        v.                                :
                                             :            C.A. No. 15-344-LPS

PERSEON CORPORATION (f/k/a BSD        :
MEDICAL CORPORATION); TIMOTHY         :
C. MCQUAY; GERHARD W.                  :
SENNEWALD; MICHAEL NOBEL;              :
DOUGLAS P. BOYD; STEVEN G.             :
STEWART; DAMIEN E. DUPUY;              :
HAROLD R. WOLCOTT; WILLIAM S.          :
BARTH, DENNIS P. GAUGER; SAM           :
MARAVICH, JR.; and CLINTON E.          :
CARNELL, JR.,                          :
                                           :

        Defendants.                        :
                                           :

---

Kevin J. Mangan, Jill Kornhauser Agro, WOMBLE CARLYLE SANDRIDGE RICE, Wilmington, DE

      Attorneys for Plaintiff.

Alessandra Glorioso, Robert W. Mallard, DORSEY & WHITNEY (DELAWARE) LLP, Wilmington, DE

      Attorneys for Defendants.

Kyle E. Witherspoon, Milo Steven Marsden, DORSEY & WHITNEY LLP, Salt Lake City, UT

      Attorneys for Defendant Perseon Corporation.

### <u>MEMORANDUM OPINION</u>

March 29, 2016
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I.      INTRODUCTION

Plaintiff Paul Schwartz ("Plaintiff") filed this action pursuant to the Securities Exchange

Act of 1934[1] and Delaware law alleging securities fraud, gross negligence, and breach of

fiduciary duty.  Plaintiff asserts his claims both directly (on behalf of himself) and derivatively

(on behalf of Defendant Perseon Corporation).  Plaintiff filed his Complaint on April 29, 2015.

(D.I. 1)

On June 30, 2015, Defendants Perseon Corporation ("BSD"), Timothy C. McQuay,

Gerhard W. Sennewald, Michael Nobel, Douglas P. Boyd, Steven G. Stewart, Damien E. Dupuy,

Harold R. Wolcott, William S. Barth, Dennis P. Gauger, Sam Maravich, Jr., and Clinton E.

Carnell, Jr. ("Individual Defendants") filed a motion to dismiss the Complaint for failure to state

a claim.  (D.I. 7)  The Individual Defendants argue that Plaintiff has failed to adhere to the

heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation

Reform Act ("PSLRA").  (D.I. 8 at 11)  The Individual Defendants also argue that the derivative

claims should be dismissed pursuant to the business judgment rule.  (*Id.* at 24)

The Court heard oral argument on February 26, 2016.  (D.I. 25 ("Tr."))  On February 29,

Plaintiff sent a letter to the Court advising it of "new evidence."  (D.I. 24)  For the reasons that

follow, the Court will grant the Individual Defendants' motion but will allow Plaintiff to file an

amended Complaint.[2]

---

[1] 15 U.S.C. § 77j and 15 U.S.C. § 78t(a).

[2] While diversity jurisdiction is not specifically alleged, both sides agree that there is
complete diversity in this case.  (Tr. 22, 47)  Accordingly, the Court will decide the motion to

## II.   BACKGROUND[3]

BSD is a medical device company that focuses on research, development, and commercialization of cancer therapies.  (D.I. 1 ¶ 10)  Plaintiff learned of BSD in the summer of 2010 and "invested substantially into BSD's common stock."  (*Id.* ¶¶ 22, 26)  As BSD has repeatedly disclosed, the company has never generated an operating profit.  (*See, e.g.*, D.I. 9 Ex. U at 17) (2009 10-K stating: "Since our inception in 1978, our expenses have substantially exceeded our revenue, resulting in continuing losses and an accumulated deficit of $16,674,122 at August 31, 2009.")

After Plaintiff purchased his shares, the price of BSD stock dropped significantly.  (D.I. 1 ¶ 27)  In particular, the price per share dropped from $7.03 in November 2010 to $0.99 in June 2014.  (*Id.* ¶ 58)  Throughout this period, Defendants issued press releases describing new opportunities for BSD and its investors.  (*Id.* ¶¶ 28-59)  For example, in April 2012, BSD issued a press release stating that it was "experiencing early success with a revenue stream from sales of disposable antennas" (*id.* ¶ 29), and in October 2012, BSD announced "a 391% increase in sales for the MircoThermX . . . product line for September 2012 as compared to September 2011" (*id.* ¶ 33).  In other press releases, the company disclosed "a 586% increase in sales for the MicroThermX . . . product line" (*id.* ¶ 35), plans for "significant expansion in the distribution of [its] MicroThermX systems in Europe" (*id.* ¶ 41), "an exclusive, long-term, multi-million dollar

---

dismiss with respect to both state and federal claims.

[3]This recitation is based, as it must be at this stage, on taking as true all well-pleaded factual allegations in the Complaint.

distribution agreement . . . for the Micro ThermX [system]" (*id.* ¶ 42), and a 105% revenue increase from 2012 to 2014 (*id.* ¶ 46).

Despite these optimistic announcements, BSD was "floundering and unable to cover its operating costs." (*Id.* ¶ 47)  In order to avoid taking on debt, BSD issued "additional securities at below-market prices in an effort to fund operating expenses." (*Id.* ¶ 48)  In fact, the Individual Defendants caused BSD to issue additional securities at least three times during Plaintiff's investment period. (*Id.*) Moreover, despite the fact that the value of BSD shares was decreasing, the company provided generous compensation to its board members (*id.* ¶ 61), issued optimistic press releases (*id.* ¶ 62), and indicated that the company would experience growth (*id.* ¶ 67).

Following these events, Plaintiff wrote a letter to Defendants expressing concerns relating to "BSD's dismal corporate performance and nefarious market activities." (*Id.* ¶ 84)  When Defendants did not respond to Plaintiff's letter, Plaintiff made demand upon the board. (*Id.* ¶ 86)  Plaintiff attached a draft complaint to the demand. (*Id.*)  Shortly thereafter, Plaintiff received a letter indicating that the Board had commenced an investigation regarding the allegations in the draft complaint and would be hiring outside counsel to assist in the investigation. (*Id.* ¶ 89)  Eventually, the Board determined that Plaintiff's claims were "unfounded and entirely without merit" and that pursuing those claims in litigation would not be in BSD's best interest. (*Id.* ¶ 109)

Over the course of Defendants' investigation, BSD continued to operate at a loss. (*See id.* ¶¶ 58, 77)  BSD eventually sold its hyperthermia product line. (*Id.* ¶¶ 129-30)  This transaction did not bring any liquidity into the company. (*Id.*)  Instead, BSD received stock in a newly

formed company operated by former BSD executives. (*Id.*)  Shortly thereafter, Plaintiff filed his

Complaint in this case, alleging securities fraud, breach of fiduciary duty, and gross negligence.

## III.   LEGAL STANDARDS

### A.   Rule 12(b)(6) Motion to Dismiss

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires

the Court to accept as true all material allegations of the Complaint. *See Spruill v. Gillis*, 372

F.3d 218, 223 (3d Cir. 2004).  "The issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat

Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted).

Thus, the Court may grant a motion to dismiss only if, after "accepting all well-pleaded

allegations in the complaint as true, and viewing them in the light most favorable to plaintiff,

plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000)

(internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a

right to relief above the speculative level on the assumption that the allegations in the complaint

are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A claim is facially plausible

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).  "The complaint must state enough facts to raise a reasonable expectation that discovery

will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media

Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

4

When evaluating a complaint, the Court may consider any documents or exhibits attached to or associated with the complaint. *See* Fed. R. Civ. P. 10(c); *see also Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

### B.     Special Pleading Requirements for Securities Fraud

Securities fraud is defined in § 10(b) of the Securities Exchange Act of 1934.  As the Supreme Court explained in *Dura Pharmaceuticals, Inc. v. Broudo*, § 10(b) forbids the use or employment of any deceptive device "in connection with the purchase or sale of any security . . . in contravention of Securities and Exchange Commission rules and regulations."  544 U.S. 336, 341 (2005) (internal quotation marks omitted).  Pursuant to its statutory authority, the SEC promulgated Rule 10b-5, which states: "[i]t shall be unlawful . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  In order to state a claim for securities fraud under § 10(b), a plaintiff must allege:

> (1) a material misrepresentation (or omission); (2) scienter, i.e., a
> wrongful state of mind; (3) a connection with the purchase or sale
> of a security; (4) reliance, often referred to in cases involving
> public securities markets (fraud-on-the-market cases) as
> "transaction causation;" (5) economic loss; and (6) "loss
> causation," i.e., a causal connection between the material
> misrepresentation and the loss.

*Dura Pharmaceuticals*, 544 U.S. at 341-42 (internal citations omitted). When making these allegations, plaintiffs are required to adhere to the heightened pleading requirements imposed by the PSLRA and by Rule 9(b) of the Federal Rules of Civil Procedure. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006). The PSLRA requires plaintiffs to specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, [for allegations] made on information and belief, the . . . facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see also In re Suprema*, 438 F.3d at 276.

The PSLRA also requires plaintiffs to plead the required state of mind with particularity. *See* 15 U.S.C. § 78u-4(b)(2) ("[T]he complaint [must] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). A plaintiff can meet the "strong inference" requirement by "alleging facts to show that [the defendant] had both motive and opportunity to commit fraud" or by "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington Coat Factory*, 114 F.3d at 1418.

As noted above, a plaintiff alleging securities fraud must also adhere to the heightened pleading requirements of Fed. R. Civ. P. 9(b). Rule 9(b) requires that plaintiffs "support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Center Prop. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).[4]

---

[4]To the extent that the pleading requirements of the PSLRA conflict with those of Fed. R. Civ. P. Rule 9(b), the PSLRA takes priority. *See In re Suprema*, 438 F.3d at 276.

### C.   Pleading Requirements for Shareholder Derivative Suits

A derivative suit is a suit brought by a shareholder on behalf of a corporation.  Derivative

suits make it possible for individual shareholders "to protect the interests of the corporation from

the misfeasance and malfeasance of 'faithless directors and managers.'"  *Kamen v. Kemper Fin.*

*Servs., Inc.*, 500 U.S. 90, 95 (1991); *see also Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)

("The nature of [a derivative action] is two-fold.  First, it is the equivalent of a suit by the

shareholders to compel the corporation to sue.  Second, it is a suit by the corporation, asserted by

the shareholders on its behalf, against those liable to it.").  While derivative suits play an

important role in corporate governance, the concept of a derivative suit is in tension with a

fundamental principle of corporate law: that directors, rather than shareholders, manage the

business and affairs of the corporation.  *See Aronson*, 473 A.2d at 811.  Directors' control over a

corporation extends to decisions regarding whether the corporation should initiate litigation.  *See*

*Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) ("The decision to bring a law suit or to

refrain from litigating a claim on behalf of a corporation is a decision concerning the

management of the corporation.").  Thus, while derivative suits make it possible for shareholders

to challenge negligent, corrupt, or irresponsible corporate action, derivative suits also allow

individual shareholders to thrust corporations into costly and unnecessary litigation.  *See Levine*

*v. Smith*, 591 A.2d 194, 200 (Del. 1991) (describing potential for conflict between directors'

power to manage corporation and shareholders' power to sue derivatively).

To resolve this tension and prevent abuse, courts require plaintiffs to "make demand" on

a corporation prior to bringing a derivative suit.  *See, e.g., Kamen*, 500 U.S. at 96; *Levine*, 591

A.2d at 200.  Would-be plaintiffs are required to "afford the directors an opportunity to exercise

their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." *Kamen*, 500 U.S. at 96 (internal quotation marks omitted).

While demand is required in most cases, demand need not be made where it would be futile. Under Delaware law,[5] demand is considered futile (and thus excused) if there is a reasonable doubt that (1) the directors are disinterested and independent and (2) the challenged transaction was the product of a valid exercise of business judgment. *See Aronson*, 473 A.2d at 814 (explaining that demand is futile "where officers and directors are under an influence which sterilizes their discretion, [such that] they cannot be considered proper persons to conduct litigation on behalf of the corporation").

A plaintiff's decision to make demand (rather than allege demand futility) has several important consequences. Notably, Delaware courts have concluded that "[b]y making a demand, a stockholder tacitly acknowledges the absence of facts to support a finding of futility." *Spiegel*, 571 A.2d at 775. Consequently, a shareholder who makes demand can no longer argue that demand was futile or that the directors were incapable of acting independently. *See id.* This does not, however, mean that a board's denial of a demand is fatal to a derivative case. As the Delaware Supreme Court has stated:

> Simply because the composition of the board provides no basis *ex ante* for the stockholder to claim . . . that a majority of the board is either interested or not independent, it does not necessarily follow

---

[5]Whether a derivative suit was properly commenced is a question of state law. *See RCM Sec. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1326-30 (2d Cir. 1991) (explaining that federal courts should apply state law to determine adequacy of demand, even when derivative suit alleges violations of federal law).

> *ex post* that the board in fact ***acted*** independently, disinterestedly
> or with due care in response to the demand.

*Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996).  In order for a derivative action to continue

after demand has been made and denied, a complaint must allege facts that create a reasonable

doubt as to the board's good faith and/or the reasonableness of its investigation.  *See Boeing Co.*

*v. Shrontz*, 1994 WL 30542 at *2 (Del. Ch. Jan. 19, 1994).

**IV.    DISCUSSION**

**A.    Fraud Claims**

The Court concludes that Plaintiff has failed to state a claim for federal securities fraud

and state law fraud because the Complaint does not sufficiently allege a material

misrepresentation or omission.  Below, the Court considers each of the alleged material

misrepresentations, finding that none of them provide an adequate basis for Plaintiff's fraud

claims.

**1.    General Allegations Relating to Increased
Revenues and Company Growth**

The first alleged misrepresentation or omission refers to a series of press releases that

announced BSD initiatives, disclosed increased revenues, and described company growth.  (*See*

D.I. 1 ¶¶ 28-46 (quoting allegedly deceptive statements))  The Complaint alleges that "[d]espite

touting impressive revenue figures and purported sales during the Investment Period . . . BSD

was floundering and unable to cover its operating costs, including significant executive

compensation." (*Id.* ¶ 47)  This set of allegations is insufficient for several reasons.

First, the allegation is not sufficiently specific to satisfy the particularity requirements of

the PSLRA, which requires plaintiffs to "specify each statement alleged to have been

9

misleading" along with "the reason or reasons why the statement is misleading." Generalized

claims that the Individual Defendants "tout[ed] impressive revenue figures and purported sales"

do not identify any specific statement or press release.[6]  For the same reasons, these allegations

fail to satisfy the particularity requirements of Rule 9(b). *See In re Rockefeller Center*, 311 F.3d

at 216.

Second, the allegation does not explain *how* the statements are misleading.  The fact that

a company can boast impressive revenue figures and increased sales does not necessarily mean

the company is thriving or even solvent.  The statements are not alleged to have said anything

about BSD's expenses or operating costs.  As such, it is not clear how Defendants' statements

were misleading.  Without a more specific allegation, Plaintiff's claim fails.

Third, Defendants' contemporaneous filings with the Securities and Exchange

Commission ("SEC") render implausible the allegation that the releases and reports were

materially misleading.  Corporate statements such as those cited in the Complaint are not

considered in a vacuum.  Instead, for purposes of evaluating securities fraud allegations, courts

review the allegedly fraudulent statements or omissions in light of all of the company's

disclosures and the entirety of market information. *See Lilley v. Charren*, 17 Fed. App'x. 603,

606 (9th Cir. Aug. 24, 2001) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th

---

[6]While it is possible that Plaintiff intended to reference the press releases quoted earlier in
the Complaint, the text of the Complaint does not make this clear enough to satisfy the
requirements of the PSLRA.  The preceding portion of the Complaint quoted 18 press releases
and reports (*see* D.I. 1 ¶¶ 28-46), but not all of the quoted statements referenced "impressive
revenue figures" or "purported sales" (*see id.* ¶ 31 (describing advances in technology), *id.* ¶ 32
(announcing switch to new sales model)).  It appears, then, that Plaintiff does not intend to allege
that *each* of the 18 press releases and reports were materially misleading.  But this is not clear
from the Complaint.

Cir. 1994)). If alleged omissions "are contradicted by the company's public disclosures . . . there can be no Section 10(b) claim." *Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013).[7] Investors are "deemed to know" information in a company's public disclosures. *Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P.*, 435 F.3d 396, 403 (3d Cir. 2006). The issue is whether the allegedly misleading statements "significantly alter[] the 'total mix' of information." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999).

Here, it is undisputed that BSD's SEC filings before, during, and after Plaintiff's investment period disclosed that BSD was operating at a loss. For example, BSD's 2009 10-K disclosed, in bold and italics: "***We have a history of significant operating losses and such losses may continue in the future.***" (D.I. 9 Ex. U at 17) That same annual report further disclosed that the company had lost more than $11 million in the most recent year, that the company would require "significant revenue increases" in order to become profitable, and that the company's directors and officers "could discourage or prevent a takeover, even if an acquisition would be beneficial to [the] stockholders." (*Id.* at 17, 23) The report also explained that the recent economic downturn had negatively impacted sales and that the company had lost over $6.5 million dollars in mutual funds. (*Id.* at 29, 32-33) BSD made similar disclosures in each of its 10-K and 10-Q filings during the period in which Plaintiff was investing in BSD stock. (*See* D.I. 9 Exs. A-T) In the face of these regular and consistent disclosures, Plaintiff's allegations are not plausible.

---

[7] At the hearing, both parties agreed that Plaintiff can be charged with knowledge of Defendants' SEC filings. (*See* Tr. 8, 38)

11

Plaintiff contends that the warnings contained in BSD's SEC filings amount to "boilerplate" that was "nearly identical year-over-year." (D.I. 13 at 23) The Third Circuit has explained that "a vague or blanket . . . disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions." *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371 (3d Cir. 1993). The warnings contained in BSD's SEC filings are not mere boilerplate. Instead, they are substantive statements tailored to the specifics of BSD's past and projected future performance. The statements in BSD's filings (including those cited above) do not simply warn potential investors of the risks inherent in any investment. Rather, they provide a detailed account of BSD's losses from year to year (including specific amounts), warn that the losses might continue, and explain why. (*See* D.I. 9 Exs. A-T) The fact that some of the warnings use identical language each year does not render them insufficient or boilerplate; rather, it appears to indicate that BSD faced similar risks each year.

## 2.    Capital-Raising Activities

The next alleged misrepresentation or omission relates to BSD's capital-raising activities. A press release issued on November 14, 2012 stated that company officials believed that BSD was "sufficiently capitalized." (D.I. 1 ¶ 52) Similarly, a press release from October 1, 2012 announced that the company had a shelf registration allowing the issuance of "up to $50 million in mixed securities" but that the company had "no current plans" to issue new securities. (*Id.* ¶ 51) The Complaint alleges that these statements were deceptive because BSD subsequently announced on April 9, 2013 (and again on June 26, 2014) that it had "entered into a securities

12

purchase agreement," the proceeds from which would "be used for general working capital purposes." (*Id.* ¶¶ 54, 56)

This allegation is insufficient because it does not explain how the press releases were deceptive. The fact that BSD decided to sell securities in April 2013 and June 2014 does not show that its earlier statements (issued six and twenty months earlier) were misleading. Indeed, the October and November 2012 releases contemplate the possibility that BSD would elect to issue additional shares. The statements indicate that "[a]lthough BSD has no current plans to do so, it may periodically offer one or more of these securities in amounts, prices and on terms to be announced when and if the securities are offered." (*Id.* ¶ 51)

### 3.    Increased Sales and Revenue

Plaintiff alleges that a 2013 press release announcing new sales and the prospect of increased revenue was materially misleading because it led him to believe that BSD was performing better than it actually was. (*See id.* ¶ 70; D.I. 13 at 19) The press release announced that "a major East Coast academic medical center . . . [had] purchased a [BSD hyperthermia system]" and that expansion in the Asian market could lead to tens of millions of dollars in revenue. (*See id.* ¶ 70) Plaintiff argues that these statements were contradicted by a subsequent 10-K report, which "revealed that 'the number of hyperthermia systems sold [had] decreased.'" (*Id.*) Once again, the Complaint does not explain how the two statements contradict. A company could make a large sale and be optimistic about future sales while, at the same time, experience an overall decline in sales. In any case, each of BSD's 10-Ks and 10-Qs filed between August 2009 and February 2013 contains a chart showing the exact number of sales of each of BSD's

13

hyperthermia products, providing all the information a reasonable investor would need to put any sales announcement in context. (*See* D.I. 9 Exs. A, C-O, U)

Several of Plaintiff's other allegations exhibit a similar pattern – Plaintiff identifies a true statement and argues that the statement is misleading,[8] while ignoring additional disclosures that provide relevant background information and context.[9]  Plaintiff's contentions fail in light of the information that BSD disclosed to the market. *See Lilley*, 17 Fed. App'x. at 606.

### 4.    Predictions of Future Success

Next, Plaintiff alleges that several statements predicting future BSD success were materially misleading.  (*See* D.I. 1 ¶ 75 (challenging Defendants' prediction that BSD would "flourish"); *id.* ¶ 76 (same for expectation that new sales contract would make "a substantial contribution" to revenue); *id.* ¶ 77 (same for opinion that BSD was "headed towards profitability"))  None of these statements contains any statement of fact; they are simply predictions about BSD's future.  Such "non-specific statement[s] of optimism or hope that a trend will continue . . . have been almost uniformly rejected by the courts" as a basis for a securities fraud claim. *In re Burlington Coat Factory*, 114 F.3d at 1427.  These statements are

---

[8]Plaintiff points to statements that announced a "391% increase in [annual] sales," "a 586% increase in [quarterly] sales," "a 319% increase in [monthly] sales," and a 105% increase in annual revenue. (D.I. 1 ¶¶ 72-74, 77; *see also* D.I. 13 at 17-19 (arguing that statements are misleading))

[9]In addition to providing specific sales information in each of its annual reports (*see id.*), many of BSD's filings warn that "revenues can fluctuate significantly from period to period" and that sales "have been based upon a relatively small number of hyperthermia systems, the sales price of each being substantial enough to greatly impact revenue levels in the periods in which they occur . . . ." (D.I. 9 Ex. I at 11; D.I. 9 Ex. M at 5 (providing disclaimer in bold); D.I. 9 Ex. Q at 6 (same))

14

"puffery," *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 811 (2d Cir. 1996), and are "too vague to be actionable," *In re Burlington Coat Factory*, 114 F.3d at 1427; *see also Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir. 1994); 15 U.S.C.[10]

### 5.    Statements Describing Scope of Geographic Coverage

The next alleged misrepresentation or omission relates to an August 2012 press release stating that BSD had "direct sales representatives covering . . . Florida, New York, New Jersey, Philadelphia, Chicago, Detroit, Phoenix, Las Vegas, southern California, Dallas and Houston." (D.I. 13 Ex. 6)  Plaintiff claims this statement was revealed to be false in October 2014, when BSD issued another press release stating, "we *now* have full sales coverage through the entire United States."  (D.I. 1 ¶ 78 (emphasis added in Complaint))  Despite Plaintiff's claims, the two press releases are not mutually exclusive.  It is possible that BSD had sales coverage in the listed states and cities in August 2012, but did not have national coverage until October 2014.

### 6.    Sale of the Hyperthermia Product Line

Plaintiff next finds material misrepresentations or omissions in statements relating to BSD's attempts to sell the hyperthermia product line.  Plaintiff argues that a September 2014 press release was misleading because it announced a multi-year contract for the sale of BSD products but neglected to mention that Defendants intended to sell the hyperthermia product line. (See *id.* ¶¶ 81-82; *see also* D.I. 13 at 19-20)  Once again, Plaintiff has failed to make sufficient allegations to show how the press release deceived or misled investors.  The fact that BSD

---

[10]Such statements may also be protected by the PSLRA's safe harbor provision, relating to "forward-looking" statements that are "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5©.  The Court need not decide this issue.

entered into a contract to sell specific hyperthermia machines does not mean BSD was *not* also attempting to sell the entire product line. Moreover, no later than July of 2013, in a 10-Q filing, BSD disclosed that it had "engaged Roth Capital Partners . . . to serve as our exclusive advisor with the goal to seek out, identify opportunities and, if possible, secure a transaction or transaction(s) relating to BSD's hyperthermia business, including but not limited to, partnering or other collaborative agreements, a sale of assets and/or other strategic arrangements." (D.I. 9 Ex. P at 17) This disclosure was repeated several times before the September 2014 press release on which Plaintiff relies. (*See* D.I. 9 Ex. B at 3; D.I. 9 Ex. Q at 4; D.I. 9 Ex. R at 12; D.I. 9 Ex. S at 11; D.I. 9 Ex. T at 11) There is no allegation that BSD ever disclosed that it was *not* seeking to sell the hyperthermia line. In light of these disclosures, the September 2014 press release on which Plaintiff relies is not materially false or misleading.

### 7.    Representations Regarding Legal Proceedings

Plaintiff alleges that BSD made material misrepresentations and omissions regarding Plaintiff's pending litigation. Specifically, Plaintiff contends that BSD's November 2014 10-K and January 2015 10-Q failed to disclose his pending litigation (D.I. 1 ¶¶ 111-12) despite the fact that he had already made demand (*id.* ¶ 111). Even assuming this omission made the identified statements materially false or misleading in general, they were not material to Plaintiff, who obviously had full knowledge about the existence and allegations of his proposed lawsuit. Plaintiff, then, cannot have been misled by the identified statements.[11]

---

[11]The Individual Defendants also move to dismiss based on the Complaint's failure to adequately allege loss causation and scienter. Given the Court's conclusion regarding the inadequacy of the allegations of material false and misleading statements or omissions, the Court does not address the other purported pleading deficiencies.

16

### B.      Derivative Claims

Plaintiff seeks to assert several derivative claims: breach of fiduciary duties (D.I. 1

¶¶ 175-78), negligence (*id.* ¶¶ 179-83), and fraud (Tr. 32).[12]  The Individual Defendants argue

that these claims should be dismissed because the Board exercised its discretion and rejected

Plaintiff's demand.  (D.I. 8 at 24)  The Court agrees with the Individual Defendants that the

derivative claims should be dismissed.

As noted above, "[b]y making demand, plaintiffs concede the independence and

disinterestedness of a majority of the . . . board. . . .  Accordingly, in order to prevail, plaintiffs

[that have made demand and had their demand rejected] must raise a reasonable doubt as to the

directors' good faith and/or the reasonableness of their investigation."  *Boeing*, 1994 WL 30542,

at *2.  Plaintiff argues that his derivative claims should proceed, despite having made demand,

for two reasons: (i) the Board was incapable of rendering a disinterested or independent decision

(D.I. 13 at 7-8), and (ii) the Board's investigation in response to his demand was not conducted

in a fair and independent manner (*see id.* at 8-10).

Neither of Plaintiff's arguments is persuasive.  The first argument fails because one

consequence of having made demand is that Plaintiff is precluded from arguing that he was

incapable of acting independently.  *See Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d

70, 74 (Del. 1997) ("If the stockholders make a demand . . . they are deemed to have waived any

claim they might otherwise have had that the board cannot independently act on the demand.").

The second argument fails because Plaintiff's criticisms of the Board's investigation – that it was

---

[12]At the hearing, Defendants argued that securities fraud claims cannot be asserted
derivatively.  (Tr. 47)  Plaintiff disagreed.  (*See id.* 32)  Because this issue was not briefed, and
resolution of it would not alter the outcome, the Court need not resolve it.

untimely, incomplete, and non-transparent (D.I. 13 at 8) – do not give rise to "a reasonable doubt as to the directors' good faith and/or the reasonableness of [the] investigation." *Boeing*, 1994 WL 30542, at *2.[13]

As for the timeliness criticism, Plaintiff's argument that the investigation took too long does not create a reasonable doubt as to reasonableness of the investigation. There is no rule that specifies how long an investigation should take. Instead, the "amount of time needed for a response will vary in direct proportion to the complexity of the technological, quantitative, and legal issues raised by the demand." *Allison v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117-18 (D. Del.), *aff'd*, 782 F.2d 1026 (3d Cir. 1985). The fact that the investigation here took five to eight months (depending on how one counts) to complete, when the Board initially estimated it would take three to four months, is not a great difference under the circumstances. In fact, the additional time may suggest that the Board acted with greater care. (*See* D.I. 1 ¶¶ 87, 89, 109)

As for the incompleteness and transparency criticisms, Plaintiff's concern is that he was not sufficiently involved in the investigation. Plaintiff alleges that Defendants did not respond to his correspondence, did not update him over the course of the investigation, and did not interview him. (*See id.* ¶¶ 88, 91, 92, 95, 101, 105) But the Board was not obliged to involve Plaintiff in its investigation, *see Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991) (explaining that board has discretion to direct investigation), nor to apprise him of the status of the ongoing investigation, *see Gamoran v. Neuberger Berman, LLC*, 2012 WL 2148217, at *5 (S.D.N.Y.

---

[13]At the hearing, Plaintiff also argued that the investigation was not conducted in good faith because Defendants "had already preconceived conclusions before they complet[ed] their investigation." (Tr. 31) The Court was unable to find any allegations in the Complaint that support this conclusion. (*See generally* D.I. 1 ¶¶ 84-109 (describing investigation))

June 12, 2012).  As long as the Board had the information it needed to conduct a reasonable

investigation – and Plaintiff has not adequately alleged facts to raise a reasonable doubt that the

Board did have such information[14] – Plaintiff's allegations as to the incompleteness of the

investigation and its lack of transparency are unavailing.  *See Boeing* , 1994 WL 30542, at *4

(explaining that Board's failure to disclose post-investigation report does not raise doubts "where

there appears to be nothing unusual about the . . . investigation").

Once a plaintiff makes demand on a board, and the directors exercise their business

judgment to conclude that proceeding with the proposed lawsuit is not in the company's interest,

it is usually very difficult for the case to proceed.  *See, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*,

908 F.2d 1338, 1343 (7th Cir. 1990) ("Except in extraordinary cases, then, tendering a demand to

the board puts the plaintiff out of court under Delaware law."), *rev'd on other grounds*, 500 U.S.

90 (1991).  Plaintiff has not shown that this case is an exception to that general rule.

Accordingly, the Court will grant the Individual Defendants' motion to dismiss the derivative

claims.

## V.    CONCLUSION

For the reasons provided above, the Court will grant the Individual Defendants' motion to

dismiss for failure to state a claim.  Plaintiff will be given leave to file an amended Complaint.[15]

---

[14]Plaintiff does not allege that he had any information pertinent to the investigation for
which he would have been the sole source.

[15]After the hearing on this motion, Plaintiff submitted a letter to the Court describing
newly-discovered evidence.  (D.I. 24)  Because this evidence was not discussed in the Complaint,
the Court will not consider it here.  *See, e.g.*, *Frederico v. Home Depot*, 507 F.3d 188, 201-02
(3d Cir. 2007) ("[W]e do not consider after-the-fact allegations in determining the sufficiency of
[a] complaint under Rules 9(b) and 12(b)(6).").  At the hearing, Plaintiff reiterated a request in
his brief that he be permitted, if necessary, to file an amended Complaint.  (Tr. 25; *see also* D.I.

An appropriate Order follows.

---

13 at 27 & n.11)  As the Court is unable to determine at this point that an amended Complaint, potentially including the new information referenced in Plaintiff's post-hearing letter and perhaps attempting to correct deficiencies identified in this Memorandum Opinion, would be futile or otherwise objectionable, the liberal policy favoring amendment is applicable.  *See* Fed. R. Civ. P. 15(a).  Hence, the Court will grant Plaintiff's request so that he may file an amended Complaint.